## CITY OF LAFAYETTE, LOUISIANA, ET AL. *v.* LOUISIANA POWER & LIGHT CO.

No. 76–864.   Argued October 4, 1977—Decided March 29, 1978

BRENNAN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Part I, in which BURGER, C. J., and MARSHALL, POWELL, and STEVENS, JJ., joined; and an opinion with respect to Parts II and III, in which MARSHALL, POWELL, and STEVENS, JJ., joined. MARSHALL, J., filed a concurring opinion, *post,* p. 417. BURGER, C. J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 418. STEWART, J., filed a dissenting opinion, in which WHITE and REHNQUIST, JJ., joined, and in all but Part II–B of which BLACKMUN, J., joined, *post,* p. 426. BLACKMUN, J., filed a dissenting opinion, *post,* p. 441.

*Jerome A. Hochberg* argued the cause for petitioners. With him on the briefs were *James F. Fairman, Jr.,* and *Ivor C. Armistead III.*

*Andrew P. Carter* argued the cause for respondent. With him on the brief was *William T. Tete.*

*William T. Crisp* argued the cause for the National Rural Electric Cooperative Assn. et al. as *amici curiae* urging

affirmance. With him on the brief were *Robert D. Tisinger, James H. Eddleman, J. J. Davidson, Jr., C. Pinckney Roberts,* and *B. D. St. Clair.**

MR. JUSTICE BRENNAN delivered the opinion of the Court (Part I), together with an opinion (Parts II and III), in which MR. JUSTICE MARSHALL, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS joined.

*Parker* v. *Brown,* 317 U. S. 341 (1943), held that the federal antitrust laws do not prohibit a State "as sovereign" from imposing certain anticompetitive restraints "as an act of government." The question in this case is the extent to which the antitrust laws prohibit a State's cities from imposing such anticompetitive restraints.

Petitioner cities are organized under the laws of the State of Louisiana,[1] which grant them power to own and operate electric utility systems both within and beyond their city limits.[2] Petitioners brought this action in the District Court for the Eastern District of Louisiana, alleging that, among others,[3] Louisiana Power & Light Co. (LP&L), an investor-owned electric service utility with which petitioners compete

---

*Solicitor General McCree, Acting Assistant Attorney General Shenefield,* and *Barry Grossman* filed a brief for the United States as *amicus curiae* urging affirmance.

*Frederick T. Searls* and *Michael P. Graney* filed a brief for the Columbus and Southern Ohio Electric Co. et al. as *amici curiae.*

[1] See La. Const., Art. 6, §§ 2, 7 (A) (effective Jan. 1, 1975); La. Const., Art. XIV, § 40 (d) (1921) (effective prior to Jan. 1, 1975); see generally La. Rev. Stat. Ann. §§ 33:621, 33:361, 33:506 (West 1951).

[2] La. Rev. Stat. Ann. § 33:1326 (West 1951); §§ 33:4162, 33:4163 (West 1966).

[3] The complaint named as parties defendant Middle-South Utilities, Inc., a Florida corporation of which LP&L is a subsidiary, Central Louisiana Electric Co., Inc., and Gulf States Utilities, Louisiana and Texas corporations respectively, engaged in the generation, transmission, and sale of electric power at wholesale and retail in Louisiana.

in the areas beyond their city limits,[4] committed various antitrust offenses which injured petitioners in the operation of their electric utility systems.[5] LP&L counterclaimed, seeking damages and injunctive relief for various antitrust offenses which petitioners had allegedly committed and which injured it in its business and property.[6]

Petitioners moved to dismiss the counterclaim on the ground that, as cities and subdivisions of the State of Louisiana, the "state action" doctrine of *Parker* v. *Brown,* rendered federal antitrust laws inapplicable to them. The District Court granted the motion, holding that the decision of the Court of Appeals for the Fifth Circuit in *Saenz* v. *University Interscholastic League,* 487 F. 2d 1026 (1973), required dismissal, notwithstanding that "[t]hese plaintiff cities are engaging in what is clearly a business activity . . . in which a profit is realized," and "for this reason . . . this court is reluctant to

---

[4] LP&L does not allege that it directly competes with the city of Lafayette, but does allege that the city of Plaquemine imposed tying arrangements which injured it. See Respondent's Second Amended Counterclaim, App. 33–34; Affidavit of J. M. Wyatt, Senior Vice President of LP&L, *id.,* at 37.

[5] Petitioners' complaint charged that the defendants conspired to restrain trade and attempted to monopolize and have monopolized the generation, transmission, and distribution of electric power by preventing the construction and operation of competing utility systems, by improperly refusing to wheel power, by foreclosing supplies from markets served by defendants, by engaging in boycotts against petitioners, and by utilizing sham litigation and other improper means to prevent the financing of construction of electric generation facilities beneficial to petitioners.

[6] The counterclaim, as amended, alleged that the petitioners, together with a nonparty electric cooperative, had conspired to engage in sham litigation against LP&L to prevent the financing with the purpose and effect of delaying or preventing the construction of a nuclear electric-generating plant, to eliminate competition within the municipal boundaries by use of covenants in their respective debentures, to exclude competition in certain markets by using long-term supply agreements, and to displace LP&L in certain areas by requiring customers of LP&L to purchase electricity from petitioners as a condition of continued water and gas service.

hold that the antitrust laws do not apply to *any* state activity." [7]   App. 47 (emphasis in original).  The District Court in this case read *Saenz* to interpret the "state action" exemption [8] as requiring the "holding that purely state government activities are not subject to the requirements of the antitrust laws of the United States," App. 48, thereby making petitioners' status as cities determinative against maintenance of antitrust suits against them.  The Court of Appeals for the Fifth Circuit reversed and remanded for further proceedings.[9] 532 F. 2d 431 (1976).  The Court of Appeals noted that the District Court had acted before this Court's decision in *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773 (1975), and held that "taken together" *Parker* v. *Brown* and *Goldfarb* "require the following analysis":

"A subordinate state governmental body is not *ipso facto* exempt from the operation of the antitrust laws.  Rather, a district court must ask whether the state legislature contemplated a certain type of anticompetitive restraint.  In our opinion, though, it is not necessary to point to an

[7] *Saenz* was a treble-damages action by a slide-rule manufacturer who alleged a conspiracy between a state agency, the University Interscholastic League (UIL), its director, and a private competitor of Saenz to effect the rejection of Saenz products for use in interscholastic competition among Texas public schools.  In *Saenz* the Court of Appeals affirmed the District Court's dismissal of the action against the UIL and its director on the ground that as a state agency and a state official, they were not answerable under the Sherman Act.

[8] The word "exemption" is commonly used by courts as a shorthand expression for *Parker's* holding that the Sherman Act was not intended by Congress to prohibit the anticompetitive restraints imposed by California in that case.

[9] In entering its order dismissing the counterclaim, the District Court made an express determination that there was no just reason for delay and expressly directed the entry of judgment for plaintiffs pursuant to Fed. Rule Civ. Proc. 54 (b).  This action designated the dismissal as a final appealable order.  See *Liberty Mutual Ins. Co.* v. *Wetzel,* 424 U. S. 737, 742–743 (1976).

express statutory mandate for each act which is alleged to violate the antitrust laws. It will suffice if the challenged activity was clearly within the legislative intent. Thus, a trial judge may ascertain, from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of. On the other hand, as in *Goldfarb*, the connection between a legislative grant of power and the subordinate entity's asserted use of that power may be too tenuous to permit the conclusion that the entity's intended scope of activity encompassed such conduct. Whether a governmental body's actions are comprehended within the powers granted to it by the legislature is, of course, a determination which can be made only under the specific facts in each case. A district judge's inquiry on this point should be broad enough to include all evidence which might show the scope of legislative intent." 532 F. 2d, at 434–435 (footnotes omitted).

We granted certiorari, 430 U. S. 944 (1977). We affirm.

I

Petitioners' principal argument is that "since a city is merely a subdivision of a state and only exercises power delegated to it by the state, *Parker*'s findings regarding the congressionally intended scope of the Sherman Act apply with equal force to such political subdivisions." Brief for Petitioners 5. Before addressing this question, however, we shall address the contention implicit in petitioners' arguments in their brief that, apart from the question of their exemption as agents of the State under the *Parker* doctrine, Congress never intended to subject local governments to the antitrust laws.

A

The antitrust laws impose liability on and create a cause of action for damages for a "person" or "persons" as defined in

the Acts.[10]   Since the Court has held that the definition of "person" or "persons" embraces both cities and States, it is understandable that the cities do not argue that they are not "persons" within the meaning of the antitrust laws.

Section 8 of the Sherman Act, ch. 647, 26 Stat. 210, 15 U. S. C. § 7 (1976 ed.), and § 1 of the Clayton Act, 38 Stat. 730, 15 U. S. C. § 12 (1976 ed.), are general definitional sections which define "person" or "persons," "wherever used in this [Act] . . . to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." [11]   Section 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15 (1976 ed.), provides,

---

[10] The word "person" or "persons" is used repeatedly in the antitrust statutes.   For examples, see 15 U. S. C. § 1 (1976 ed.) ("Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony . . ."); 15 U. S. C. § 2 (1976 ed.) ("Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . ."); 15 U. S. C. § 3 (1976 ed.) ("Every person [making a contract or engaging in a combination or conspiracy in restraint of trade in any Territory or the District of Columbia] shall be deemed guilty of a felony . . ."); 15 U. S. C. § 7 (1976 ed.) (defining the word "person" or "persons"); 15 U. S. C. § 8 (1976 ed.) (declaring illegal every contract, combination, or conspiracy in restraint of trade by persons or corporations engaged in importing articles into the United States, and providing that any person so engaged shall be guilty of a misdemeanor).

[11] Section 8 of the Sherman Act provides in full:

"That the word 'person,' or 'persons,' wherever used in this act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country."

Section 8 has remained unchanged since its enactment in 1890.

Section 1 of the Clayton Act defines the word "person" or "persons" in language identical to that of § 8 of the Sherman Act, and it also has remained unchanged since its enactment in 1914.

in pertinent part, that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court . . . , and shall recover threefold the damages by him sustained . . . ." [12]

*Chattanooga Foundry & Pipe Works* v. *Atlanta,* 203 U. S. 390 (1906), held that a municipality is a "person" within the meaning of § 8 of the Sherman Act, the general definitional section, and that the city of Atlanta therefore could maintain a treble-damages action under § 7, the predecessor of § 4 of the Clayton Act,[13] against a supplier from whom the city purchased water pipe which it used to furnish water as a municipal utility service. Some 36 years later, *Georgia* v. *Evans,* 316 U. S. 159 (1942), held that the words "any person" in § 7 of the Sherman Act included States. Under that decision, the State of Georgia was permitted to bring an action in its own name charging injury from a combination to fix prices and suppress competition in the market for asphalt which the

---

[12] Section 4 is quoted in full in n. 13, *infra.*

[13] Section 7 of the Sherman Act, ch. 647, 26 Stat. 210 (1890) (repealed in 1955), provided in full:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

Section 4 of the Clayton Act provides in full:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Section 4 has remained unchanged since its enactment in 1914. It is made applicable to all of the antitrust statutes by § 1 of the Clayton Act, 15 U. S. C. § 12 (1976 ed.).

State purchased annually for use in the construction of public roads. The Court reasoned that "[n]othing in the Act, its history, or its policy, could justify so restrictive a construction of the word 'person' in § 7 as to exclude a State." 316 U. S., at 162.

Although both *Chattanooga Foundry* and *Georgia* v. *Evans* involved the public bodies as plaintiffs, whereas petitioners in the instant case are defendants to a counterclaim, the basis of those decisions plainly precludes a reading of "person" or "persons" to include municipal utility operators that sue as plaintiffs but not to include such municipal operators when sued as defendants. Thus, the conclusion that the antitrust laws are not to be construed as meant by Congress to subject cities to liability under the antitrust laws must rest on the impact of some overriding public policy which negates the construction of coverage, and not upon a reading of "person" or "persons" as not including them.[14]

B

Petitioners suggest several reasons why, in addition to their arguments for exemption as agents of the State under the *Parker* doctrine, a congressional purpose not to subject cities

---

[14] When Congress wished to exempt municipal service operations from the coverage of the antitrust laws, it has done so without ambiguity. The Act of May 26, 1938, ch. 283, 52 Stat. 446, 15 U. S. C. § 13c (1976 ed.), grants a limited exemption to certain not-for-profit institutions for "purchases of their supplies for their own use" from the provisions of the Clayton Act as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. §§ 13 to 13b and 21a (1976 ed.), which otherwise make it unlawful for a supplier to grant, or for an institution to induce, a discriminatory discount with respect to such supplies. Congress expressly included public libraries in this exemption. (Public libraries are, by definition, operated by local government. See 1 U. S. Office of Education, Biennial Surveys of Education in the United States, ch. 8 (Library Service 1938–1940), p. 27 (1947); 2 U. S. Office of Education, ch. 2 (Statistical Summary of Education, 1941–1942), p. 38; 32 Am. Library Assn. Bull. 272 (1938)).

to the antitrust laws should be inferred. Those arguments, like the *Parker* exemption itself, necessarily must be considered in light of the presumption against implied exclusions from coverage under the antitrust laws.

## (1)

The purposes and intended scope of the Sherman Act have been developed in prior cases and require only brief mention here. Commenting upon the language of the Act in rejecting a claim that the insurance business was excluded from coverage, the Court stated: "Language more comprehensive is difficult to conceive. On its face it shows a carefully studied attempt to bring within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states." *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 553 (1944). That and subsequent cases reviewing the legislative history of the Sherman Act have concluded that Congress, exercising the full extent of its constitutional power,[15] sought to establish a regime of competition as the fundamental principle governing commerce in this country.[16]

For this reason, our cases have held that even when Congress by subsequent legislation establishes a regulatory regime over an area of commercial activity, the antitrust laws will not be displaced unless it appears that the antitrust and regulatory provisions are plainly repugnant. *E. g., United States* v.

[15] See *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S, 219, 229–235 (1948).

[16] "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster." *United States* v. *Topco Associates*, 405 U. S. 596, 610 (1972).

*Philadelphia Nat. Bank,* 374 U. S. 321, 350–351, and n. 28 (1963) (collecting cases). The presumption against repeal by implication reflects the understanding that the antitrust laws establish overarching and fundamental policies, a principle which argues with equal force against implied exclusions. See *Goldfarb,* 421 U. S., at 786–788.

Two policies have been held sufficiently weighty to override the presumption against implied exclusions from coverage of the antitrust laws. In *Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961), the Court held that, regardless of anticompetitive purpose or intent, a concerted effort by persons to influence lawmakers to enact legislation beneficial to themselves or detrimental to competitors was not within the scope of the antitrust laws. Although there is nothing in the language of the statute or its history which would indicate that Congress considered such an exclusion, the impact of two correlative principles was held to require the conclusion that the presumption should not support a finding of coverage. The first is that a contrary construction would impede the open communication between the polity and its lawmakers which is vital to the functioning of a representative democracy. Second, "and of at least equal significance," is the threat to the constitutionally protected right of petition which a contrary construction would entail. *Id.,* at 137–138.[17]

---

[17] See also *Mine Workers* v. *Pennington,* 381 U. S. 657, 669–672 (1965). *Pennington* held that, regardless of the anticompetitive purpose or effect on small competing mining companies, the joint action of certain large mining companies and labor unions in lobbying before the Secretary of Labor in favor of legislation establishing a minimum wage for employees of contractors selling coal to the Tennessee Valley Authority and in lobbying before TVA to avoid coal purchases exempted from the legislation was not subject to antitrust attack. Cases subsequent to *Pennington* have emphasized the possible constitutional infirmity in the antitrust laws that a contrary construction would entail in light of the serious threat to First Amendment freedoms that would have been presented. See

*Parker* v. *Brown* [18] identified a second overriding policy, namely that "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U. S., at 351.

Common to the two implied exclusions was potential conflict with policies of signal importance in our national traditions and governmental structure of federalism. Even then, however, the recognized exclusions have been unavailing to prevent antitrust enforcement which, though implicating those fundamental policies, was not thought severely to impinge upon them. See, *e. g., Goldfarb, supra; California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508 (1972).

Petitioners' arguments therefore cannot prevail unless they demonstrate that there are countervailing policies which are sufficiently weighty to overcome the presumption. We now turn to a consideration of whether, apart from the question of their exemption as agents of the State under the *Parker* doctrine, petitioners have made that showing.

## (2)

Petitioners argue that their exclusion must be inferred because it would be anomalous to subject municipalities to the criminal and civil liabilities imposed upon violators of the antitrust laws. The short answer is that it has not been regarded as anomalous to require compliance by municipalities with the substantive standards of other federal laws which impose such sanctions upon "persons." See *Union Pacific R.*

---

*Continental Ore Co.* v. *Union Carbide & Carbon Corp.,* 370 U. S. 690, 707–708 (1962); *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, 516 (1972) (STEWART, J., concurring in judgment).

[18] See also *Olsen* v. *Smith,* 195 U. S. 332, 344–345 (1904).

*Co.* v. *United States,* 313 U. S. 450 (1941).[19]   See generally
*Ohio* v. *Helvering,* 292 U. S. 360, 370 (1934); [20] *California* v.
*United States,* 320 U. S. 577 (1944).[21]   But those cases do not

[19] *Union Pacific* considered the applicability to a city of § 1 of the Elkins Act, 32 Stat. 847, as amended, 34 Stat. 587, 49 U. S. C. § 41 (1).   That statute, in definitional language similar to that used in § 8 of the Sherman Act, makes it unlawful for *"any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any [covered] common carrier . . . ."* (Emphasis added.)   Kansas City, Kan. (hereinafter Kansas), decided to develop its Public Levee as a metropolitan rail food terminal with wholesale and retail produce markets.   Kansas constructed, operated, and owned the market, financing the development with municipal revenue bonds.

Another city, Kansas City, Mo. (hereinafter Missouri), also operated a rail food terminal within the same metropolitan area.   Because Kansas believed that there was insufficient business in the metropolitan area to support both markets, it developed a plan to induce Missouri produce dealers to lease its facilities by offering cash payments and temporary reduction or abatement of rent.   These payments exceeded the amounts needed to compensate the merchants for the costs of moving, settlement of existing leases, and disruption to business.   Kansas adopted the payment plan by resolution, and its legality under Kansas law was sustained by the Kansas Supreme Court in a *quo warranto* proceeding.   *State ex rel. Parker* v. *Kansas City,* 151 Kan. 1, 97 P. 2d 104, 98 P. 2d 101 (1939).

The Missouri terminal was served by a number of railroads, but the Kansas terminal was served virtually exclusively by the Union Pacific Railroad.   As merchants moved from Missouri to Kansas, the Union Pacific's traffic necessarily increased while that of the other railroads shrank.   The United States charged that the effect of Kansas' concessions to merchants was to permit them to ship produce over the Union Pacific more cheaply than on the competing railroads serving the Missouri terminal and, in effect, amounted to a rebate from Union Pacific's tariffs.   The District Court permanently enjoined Kansas from giving cash or rental credits to Missouri dealers to move or for moving to Kansas.

On appeal to this Court, Kansas argued that because the concessions were lawful under state law, it could not be enjoined from making them, and the United States argued that the municipality was a "person" within the meaning of the statute and therefore subject to the Act on the same terms

necessarily require the conclusion that remedies appropriate to redress violations by private corporations would be equally appropriate for municipalities; nor need we decide any question of remedy in this case.[22]

as a private corporation. See Brief for Appellants, O. T. 1940, No. 594, pp. 233–235, 244–256; Brief for United States, O. T. 1940, No. 594, p. 72. See generally id., at 59–68, 69–75.

The Court held that the municipality was a "person" subject to the Act, and, with a modification not important here, upheld the permanent injunction against it. Mr. Justice Roberts, in dissent, made the argument made by the cities here, that the statutory phrase "every person" was not sufficiently specific to justify the conclusion that Congress wished to subject municipal corporations and their officers to the criminal penalties for which the Act provided. It is significant that the cities' argument was rejected in the context of the antirebate provisions of the Elkins Act, a statute which essentially is an antitrust provision serving the same purposes as the anti-price-discrimination provisions of the Robinson-Patman Act. Accord, Slater, Antitrust and Government Action: A Formula For Narrowing Parker v. Brown, 69 Nw. U. L. Rev. 71, 89 n. 100 (1974).

[20] Ohio v. Helvering sustained a federal tax liability imposed upon the State of Ohio in its business as a distributor of alcoholic beverages. The statute, Rev. Stat. § 3244 (1878), imposed a tax upon "[e]very person who sells or offers for sale [alcoholic beverages]." The applicable definitional section, Rev. Stat. § 3140 (1878), provided: "[W]here not otherwise distinctly expressed or manifestly incompatible with the intent thereof, the word 'person,' as used in this title, shall be construed to mean and include a partnership, association, company, or corporation, as well as a natural person." Helvering stated that "[w]hether the word 'person' or 'corporation' includes a state or the United States depends upon the connection in which the word is found," 292 U. S., at 370, and held that "the state itself, when it becomes a dealer in intoxicating liquors, falls within the reach of the tax either as a 'person' under the statutory extension of that word to include a corporation, or as a 'person' without regard to such extension." Id., at 371.

[21] California held that a city and State are subject to §§ 16 and 17 of the Shipping Act, 1916, 39 Stat. 734, as amended, 46 U. S. C. §§ 815, 816, making unlawful certain practices of "person[s]," defined by § 1, 46 U. S. C. § 801, as including "corporations, partnerships, and associations, existing under or authorized by the laws of the United States, or any State . . . ."

[22] The question of remedy can arise only if the District Court, on the

Petitioners next argue that the antitrust laws are intended to protect the public only from abuses of private power and not from actions of municipalities that exist to serve the public weal.

Petitioners' contention that their goal is not private profit but public service is only partly correct. Every business enterprise, public or private, operates its business in furtherance of its own goals. In the case of a municipally owned utility, that goal is likely to be, broadly speaking, the benefit of its citizens. But the economic choices made by public corporations in the conduct of their business affairs, designed as they are to assure maximum benefits for the community constituency, are not inherently more likely to comport with the broader interests of national economic well-being than are those of private corporations acting in furtherance of the interests of the organization and its shareholders. The allegations of the counterclaim, which for present purposes we accept as true,[23] aptly illustrate the impact which local governments, acting as providers of services, may have on other individuals and business enterprises with which they interrelate as purchasers, suppliers, and sometimes, as here, as competitors.[24]

LP&L alleged that the city of Plaquemine contracted to provide LP&L's electric customers outside its city limits gas and water service only on condition that the customers pur-

---

Court of Appeals remand, determines that petitioners' activities are prohibited by the antitrust laws.

[23] Cf. *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S. 738, 740 (1976). We use the allegations of the counterclaim only as a ready and convenient example of the kinds of activities in which a municipality may engage in the operation of its utility business which would have an anticompetitive effect transcending its municipal borders.

[24] See generally *Duke & Co.* v. *Foerster,* 521 F. 2d 1277 (CA3 1975); *New Mexico* v. *American Petrofina, Inc.,* 501 F. 2d 363 (CA9 1974); *Hecht* v. *Pro-Football, Inc.,* 144 U. S. App. D. C. 56, 444 F. 2d 931 (1971).

chase electricity from the city and not from LP&L.[25]  The effect of such a tie-in is twofold.  First, the tying contract might injure former LP&L customers in two ways.  The net effect of the tying contract might be to increase the cost of electric service to these customers.  Moreover, a municipality conceivably might charge discriminatorily higher rates to such captive customers outside its jurisdiction without a cost-justified basis.  Both of these practices would provide maximum benefits for its constituents, while disserving the interests of the affected customers.  Second, the practice would necessarily have an impact on the regulated public utility whose service is displaced.[26]  The elimination of customers in an established service area would likely reduce revenues, and possibly require abandonment or loss of existing equipment the effect of which would be to reduce its rate base and possibly affect its capital structure.  The surviving customers and the investor-owners would bear the brunt of these consequences.  The decision to displace existing service, rather than being made on the basis of efficiency in the distribution of services, may be made by the municipality in the interest of realizing maximum benefits to itself without regard to extra-territorial impact and regional efficiency.[27]

[25] See Respondent's Second Amended Counterclaim, App. 33.

[26] As one commentator has noted, our cases indicate that the protection against injury to the buyer is only one purpose of the rule against tying arrangements.  Equally important is the need to protect competing sellers from competition unrelated to the merits of the product involved, and, concomitantly, to protect the market from distortion.  Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv. L. Rev. 50, 60 (1958).

[27] While the investor-owned utilities in Louisiana are subject to regulation by the Louisiana Public Utilities Commission, municipally owned utilities are not subject to the jurisdiction of the PUC and hence apparently need not conform their expansion policies to whatever plans the PUC might deem advisable for coordinating service.  See n. 44, infra.

The second allegation of LP&L's counterclaim,[28] is that petitioners conspired with others to engage in sham and frivolous litigation against LP&L before various federal agencies [29] and federal courts for the purpose, and with the effect, of delaying approval and construction of LP&L's proposed nuclear electric generating plant. It is alleged that this course of conduct was designed to deprive LP&L of needed financing and to impose delay costs, amounting to $180 million, which would effectively block construction of the proposed project. Such activity may benefit the citizens of Plaquemine and Lafayette by eliminating a competitive threat to expansion of the municipal utilities in still undeveloped areas beyond the cities' territorial limits. But that kind of activity, if truly anticompetitive,[30] may impose enormous unnecessary costs on the potential customers of the nuclear generating facility both within and beyond the cities' proposed area of expansion. In addition, it may cause significant injury to LP&L, interfering with its ability to provide expanded service.

Another aspect of the public-service argument [31] is that

---

[28] See Respondent's Answer & Counterclaim, App. 18–20.

[29] The counterclaim alleged that petitioners engaged in sham litigation before the Securities and Exchange Commission, the Federal Power Commission, the Atomic Energy Commission, and the United States Department of Justice.

[30] See generally *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508 (1972).

[31] Petitioners have urged that the antimonopoly principles of the antitrust laws are inconsistent with the very nature of government operating as a monopoly in the public interest. They suggest that to apply antitrust principles to local governments will necessarily interfere with the execution of governmental programs. We do not agree. Acting as agents at the direction of the State, local governments are free to implement state policies without being subject to the antitrust laws to the same extent as would the State itself. See *infra,* at 413–417. On the other hand, it would not hinder governmental programs to require that cities authorized to provide services on a monopoly basis refrain from, for example, predatory conduct not itself directed by the State.

because government is subject to political control, the welfare of its citizens is assured through the political process and that federal antitrust regulation is therefore unnecessary. The argument that consumers dissatisfied with the service provided by the municipal utilities may seek redress through the political process is without merit. While petitioners recognize, as they must, that those consumers living outside the municipality who are forced to take municipal service have no political recourse at the municipal level, they argue nevertheless that the customers may take their complaints to the state legislature. It fairly may be questioned whether the consumers in question or the Florida corporation of which LP&L is a subsidiary have a meaningful chance of influencing the state legislature to outlaw on an ad hoc basis whatever anticompetitive practices petitioners may direct against them from time to time. More fundamentally, however, that argument cuts far too broadly; the same argument may be made regarding anticompetitive activity in which any corporation engages. Mulcted consumers and unfairly displaced competitors may always seek redress through the political process. In enacting the Sherman Act, however, Congress mandated competition as the polestar by which all must be guided in ordering their business affairs. It did not leave this fundamental national policy to the vagaries of the political process, but established a broad policy, to be administered by neutral courts,[32] which

---

[32] "The prohibitions of the Sherman Act were not stated in terms of precision or of crystal clarity and the Act itself did not define them. In consequence of the vagueness of its language, perhaps not uncalculated,[*] the courts have been left to give content to the statute, and in the performance of that function it is appropriate that courts should interpret its word in the light of its legislative history and of the particular evils at which the legislation was aimed. . . ."

"[*] See Debates, 21 Cong. Rec. 2460, 3148; 2 Hoar, Autobiography of Seventy Years 364; Senator Edmunds, *The Interstate Trust and Commerce Act of 1890*, 194 No. Am. Rev. 801, 813, 'after most careful and earnest consideration by the Judiciary Committee of the Senate it was

would guarantee every enterprise the right to exercise "whatever economic muscle it can muster," *United States* v. *Topco Associates,* 405 U. S. 596, 610 (1972), without regard to the amount of influence it might have with local or state legislatures.[33]

In 1972, there were 62,437 different units of local government in this country.[34] Of this number 23,885 were special districts which had a defined goal or goals for the provision of one or several services,[35] while the remaining 38,552 repre-

---

agreed by every member that it was quite impracticable to include by specific description all the acts which should come within the meaning and purpose of the words "trade" and "commerce" or "trust," or the words "restraint" or "monopolize," by precise and all-inclusive definitions; and that these were truly matters for judicial consideration.'

"See also Senator Hoar who with Senator Edmunds probably drafted the bill (see A. H. Walker, History of the Sherman Law (1910), p. 27–28) in 36 Cong. Rec. 522, Jan. 6, 1903: 'We undertook by law to clothe the courts with the power and impose on them and the Department of Justice the duty of preventing all combinations in restraint of trade. . . .' "

*Apex Hosiery Co.* v. *Leader,* 310 U S. 469, 489, and n. 10 (1940).

[33] The political-redress argument could also be made in the context of anticompetitive actions engaged in by the State itself. Our rejection of the argument here is not, however, inconsistent with the *Parker* doctrine. *Parker* did not reason that political redress is an adequate substitute for direct enforcement of the antitrust laws. Rather, *Parker* held that, in the absence of congressional intent to the contrary, a purpose that the antitrust laws be used to strike down the State's regulatory program imposed as an act of government would not be inferred. To the extent that the actions of a State's subdivisions are the actions of the State, the *Parker* exemption applies. See *infra,* at 413–417.

[34] 1 U. S. Bureau of the Census, 1972 Census of Governments, Governmental Organization 1 (1973). This figure (62,437) represents the total of county, municipal, township, and special district governments, but does not include the 15,781 independent school districts in the United States which, of course, have a much more narrowly defined range of functions and powers than those of local governmental units generally. See *id.,* at 1–5.

[35] See *id.,* at 4–5.

sented the number of counties, municipalities, and townships, most of which have broad authority for general governance subject to limitations in one way or another imposed by the State.[36] These units may, and do, participate in and affect the economic life of this Nation in a great number and variety of ways. When these bodies act as owners and providers of services, they are fully capable of aggrandizing other economic units with which they interrelate, with the potential of serious distortion of the rational and efficient allocation of resources, and the efficiency of free markets which the regime of competition embodied in the antitrust laws is thought to engender.[37] If municipalities were free to make economic choices counseled solely by their own parochial interests and without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced at odds with the comprehensive national policy Congress established.[38]

We conclude that these additional arguments for implying an exclusion for local governments from the antitrust laws must be rejected. We therefore turn to petitioners' principal argument, that "*Parker*'s findings regarding the congressionally intended scope of the Sherman Act apply with equal force to such political subdivisions." Brief for Petitioners 5.

## II

Plainly petitioners are in error in arguing that *Parker* held that all governmental entities, whether state agencies or subdivisions of a State, are, simply by reason of their status as such, exempt from the antitrust laws.

*Parker* v. *Brown* involved the California Agricultural Pro-

---

[36] See *id.*, at 1–3.

[37] See, *e. g., Apex Hosiery Co.* v. *Leader, supra,* at 493–495, n. 15 (reviewing legislative history).

[38] See *United States* v. *Topco Associates,* 405 U. S., at 610; *Apex Hosiery Co.* v. *Leader, supra,* at 492–495, and n. 15; *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219, 229–235 (1948).

rate Act enacted by the California Legislature as a program to be enforced "through action of state officials . . . to restrict competition among the growers [of raisins] and maintain prices in the distribution of their commodities to packers." 317 U. S., at 346. The Court held that the program was not prohibited by the federal antitrust laws since "nothing in the language of the Sherman Act or in its history . . . suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature," *id.*, at 350–351, and "[t]he state . . . as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.*, at 352.

*Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), underscored the significance of *Parker*'s holding that the determinant of the exemption was whether the challenged action was "an act of government" by the State as "sovereign." *Parker* repeatedly emphasized that the anticompetitive effects of California's prorate program derived from "the state['s] command"; the State adopted, organized, and enforced the program "in the execution of a governmental policy." [39] 317 U. S., at 352. *Goldfarb*, on the other hand, presented the question "whether a minimum-fee schedule for lawyers published by the Fairfax County Bar Association and enforced by the Virginia State Bar," 421 U. S., at 775, violated the Sherman Act. Exemption was claimed on the ground that the Virginia State Bar was "a state agency by law." *Id.*, at 790. The Virginia Legislature had empowered the Supreme Court of Virginia to regulate the practice of law and had assigned the State Bar a role in that regulation as an administrative agency of the Virginia Supreme Court. But no Virginia statute referred to lawyers' fees and the Supreme Court of Virginia had taken no action requiring the use of and adherence to mini-

---

[39] The state regulatory program involved in *Parker* furthered an important state interest which was consistent with federal policy. See *Parker*, 317 U. S., at 352–359.

mum-fee schedules. *Goldfarb* therefore held that it could not be said that the anticompetitive effects of minimum-fee schedules were directed by the State acting as sovereign. *Id.,* at 791. The State Bar, though acting within its broad powers, had "voluntarily joined in what is essentially a private anticompetitive activity," *id.,* at 792, and was not executing the mandate of the State. Thus, the actions of the State Bar had failed to meet "[t]he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe. . . ." *Id.,* at 790. *Goldfarb* therefore made it clear that, for purposes of the *Parker* doctrine, not every act of a state agency is that of the State as sovereign.

*Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977), involved the actions of a state agency to which the *Parker* exemption applied. *Bates* considered the applicability of the antitrust laws to a ban on attorney advertising directly imposed by the Arizona Supreme Court. In holding the antitrust laws inapplicable, *Bates* noted that "[t]hat court is the ultimate body wielding the State's power over the practice of law, see Ariz. Const., Art. 3; *In re Bailey,* 30 Ariz. 407, 248 P. 29 (1926), and, thus, the restraint is 'compelled by direction of the State acting as a sovereign.'" *Id.,* at 360, quoting *Goldfarb, supra,* at 791. We emphasized, moreover, the significance to our conclusion of the fact that the state policy requiring the anticompetitive restraint as part of a comprehensive regulatory system, was one clearly articulated and affirmatively expressed as state policy, and that the State's policy was actively supervised by the State Supreme Court as the policymaker.[40]

---

[40] The plurality opinion in *Cantor* v. *Detroit Edison Co.,* 428 U. S. 579 (1976), also analyzed a "state action" exemption claim in terms of whether the challenged anticompetitive action was taken pursuant to state command. Detroit Edison, an electric utility regulated by Michigan, was charged by an independent seller of light bulbs with antitrust violations in the operation of a program which provided light bulbs without extra cost

These decisions require rejection of petitioners' proposition that their status as such automatically affords governmental entities the "state action" exemption.[41] *Parker*'s limitation

to electricity customers. Detroit Edison, relying on *Parker*, defended on the ground that the light-bulb program was included in its rate filed with and approved by the State Public Service Commission and that state law required it to follow the terms of the tariff as long as it was in effect. *Cantor* rejected the claim, holding that since no Michigan statutes regulated the light-bulb industry, and since neither the Michigan Legislature nor the Public Service Commission had passed upon the desirability of such a light-bulb program, the Commission's approval of Detroit Edison's program did not "implement any statewide policy relating to light bulbs" and that "the State's policy is neutral on the question whether a utility should, or should not, have such a program." 428 U. S., at 585. THE CHIEF JUSTICE, while not joining all of the plurality opinion, agreed with this analysis. *Id.*, at 604–605.

*Cantor*'s analysis is not, however, necessarily applicable here. *Cantor* was concerned with whether anticompetitive activity in which purely private parties engaged could, under the circumstances of that case, be insulated from antitrust enforcement. The situation involved here, on the other hand, presents the issue of under what circumstances a State's subdivisions engaging in anticompetitive activities should be deemed to be acting as agents of the State.

[41] Petitioners argue that *Goldfarb*, like *Cantor* v. *Detroit Edison Co.*, *supra*, expresses a limitation upon the circumstances under which *private* parties may be immunized from suit under the antitrust laws. They seek to avoid our holding in *Goldfarb* by suggesting that the State Bar, although a state agency by law acting in its official capacity, was somehow not a state agency because its official actions in issuing ethical opinions, see 421 U. S., at 791 n. 21, benefited its member-lawyers by discouraging price competition. We think it obvious that the fact that the ancillary effect of the State Bar's policy, or even the conscious desire on its part, may have been to benefit the lawyers it regulated cannot transmute the State Bar's official actions into those of a private organization. In addition to the decision in this case, every other Court of Appeals which has considered the immunity of state instrumentalities after *Goldfarb* has regarded it as having held that anticompetitive actions of a state instrumentality not compelled by the State acting as sovereign are not immune from the antitrust laws. *Fairfax* v. *Fairfax Hospital Assn.*, 562 F. 2d 280, 284–285 (CA4 1977); *id.*, at 288 (concurring opinion); *Kurek* v. *Pleasure Drive-*

of the exemption, as applied by *Goldfarb* and *Bates,* to "official action directed by [the] state," arises from the basis for the "state action" doctrine—that given our "dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority," 317 U. S., at 351, a congressional purpose to subject to antitrust control the States' acts of government will not lightly be inferred. To extend that doctrine to municipalities would be inconsistent with that limitation. Cities are not themselves sovereign; they do not receive all the federal deference of the States that create them. See, *e. g., Edelman* v. *Jordan,* 415 U. S. 651, 667 n. 12 (1974); *Lincoln County* v. *Luning,* 133 U. S. 529 (1890) (political subdivisions not protected by Eleventh Amendment from immunity from suit in federal court). *Parker's* limitation of the exemption to "official action directed by a state," 317 U. S., at 351, is consistent with the fact that the States' subdivisions generally have not been treated as equivalents of the States themselves.[42] In light of the serious economic dislocation which

*way & Park Dist.,* 557 F. 2d 580, 588–591 (CA7 1977), cert. pending, No. 77–440; *Duke & Co.* v. *Foerster,* 521 F. 2d, at 1280.

The acknowledgment of our Brother STEWART's dissent, *post,* at 433, that, as noted in *Indian Towing Co.* v. *United States,* 350 U. S. 61, 67–68 (1955), " 'Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it' " (citation omitted), discloses the fallacy of his effort to distinguish *Goldfarb* on the ground that, although the State Bar was " 'a state agency for some limited purposes,' . . . the price fixing it fostered was for the private benefit of its members and its actions were essentially those of a private professional group." *Post,* at 431.

[42] Without explication, our Brother STEWART's dissent states that our "reliance . . . on the basically irrelevant body of law under the Eleventh Amendment" is unfounded. *Ibid.* Rather, it is the statement that is unfounded. For the longstanding principle, of which Congress in 1890 was well aware, see *Lincoln County* v. *Luning,* 133 U. S. 529 (1890), is that political subdivisions are not as such sovereign. Certainly, nothing

could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, see *supra,* at 403–408, we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach.

On the other hand, the fact that municipalities, simply by their status as such, are not within the *Parker* doctrine, does not necessarily mean that all of their anticompetitive activities are subject to antitrust restraints. Since "[m]unicipal corporations are instrumentalities of the State for the convenient administration of government within their limits." *Louisiana ex rel. Folsom* v. *Mayor of New Orleans,* 109 U. S. 285, 287 (1883), the actions of municipalities may reflect state policy. We therefore conclude that the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service. There remains the question whether the Court of Appeals erred in holding that further inquiry should be made to determine whether petitioners' actions were directed by the State.

## III

The petitioners and our Brother Stewart's dissent focus their arguments upon the fact that municipalities may exercise the sovereign power of the State, concluding from this that any actions which municipalities take necessarily reflect state policy and must therefore fall within the *Parker* doctrine.

in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), even remotely suggested the contrary; we search in vain for anything in that case that establishes a constructional principle of presumptive congressional deference in behalf of cities. Indeed our emphasis today in our conclusion, that municipalities are "exempt" from antitrust enforcement when acting as state agencies implementing state policy to the same extent as the State itself, makes it difficult to see how *National League of Cities* is even tangentially implicated.

But, the fact that the governmental bodies sued are cities, with substantially less than statewide jurisdiction, has significance. When cities, each of the same status under state law, are equally free to approach a policy decision in their own way, the anticompetitive restraints adopted as policy by any one of them, may express its own preference, rather than that of the State.[43] Therefore, in the absence of evidence that the State authorized or directed a given municipality to act as it did, the actions of a particular city hardly can be found to be pursuant to "the state['s] command," or to be restraints that "the state . . . as sovereign" imposed. 317 U. S., at 352. The most [44] that could be said is that state policy may be neutral.

---

[43] "While state legislatures exercise extensive power over their constituents and over the various units of local government, the States universally leave much policy and decisionmaking to their governmental subdivisions. Legislators enact many laws but do not attempt to reach those countless matters of local concern necessarily left wholly or partly to those who govern at the local level." *Avery* v. *Midland County*, 390 U. S. 474, 481 (1968).

Although *Avery* concluded that the actions of local government are the actions of the State for purposes of the Fourteenth Amendment, state action required under *Parker* has different attributes. Cf. *Edelman* v. *Jordan*, 415 U. S. 651, 667 n. 12 (1974).

[44] Indeed, state policy may be contrary to that adopted by a political subdivision, yet, for a variety of reasons, might not render the local policy unlawful under state law. For example, a state public utilities commission might adopt, though we are not aware that the Louisiana PUC has done so, a policy prohibiting the specific anticompetitive practices in which the municipality engages, yet be unable to enforce that policy with respect to municipalities because it lacks jurisdiction over them. (The Louisiana PUC, in litigation unrelated to this case, has been held to lack jurisdiction over municipal utility systems whether operating within or without the municipality. *City of Monroe* v. *Louisiana Public Serv. Comm'n*, No. 177,757—Div. "I" (19th Jud. Dist. Ct., Sept. 14, 1976).) If that were the case, and assuming that there were no other evidence to the contrary, it would be difficult to say that state policy fosters, much less compels, the anticompetitive practices.

Louisiana Rev. Stat. Ann. § 33:1334 (G) (West Supp. 1977) provides

To permit municipalities to be shielded from the antitrust laws in such circumstances would impair the goals Congress sought to achieve by those laws, see *supra*, at 403–408, without furthering the policy underlying the *Parker* "exemption." This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit. While a subordinate governmental unit's claim to *Parker* immunity is not as readily established as the same claim by a state government sued as such, we agree with the Court of Appeals that an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." [45] 532 F. 2d, at 434.

The *Parker* doctrine, so understood, preserves to the States their freedom under our dual system of federalism to use their municipalities to administer state regulatory policies free of the inhibitions of the federal antitrust laws without at the

---

another illustration of the fact that a particular activity in which a subdivision technically has power to engage does not necessarily conform to, and may conflict with, state policy. Louisiana has authorized municipalities to create intergovernmental commissions as municipal instrumentalities jointly to construct and operate public services including utilities. §§ 33:1324, 33:1331–33:1334 (West Supp. 1977). Such commissions are, by definition, political subdivisions of the State. § 33:1334 (D) (West Supp. 1977). Section 1334 (G) nevertheless provides that "[n]othing in this Chapter shall be construed to grant an immunity to or on behalf of any [such] public instrumentality . . . from any antitrust laws of the state or of the United States."

[45] We reject petitioners' fallback position that an antitrust claim will not lie for anticompetitive municipal action which, though not state directed, is lawful under state law. See *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384 (1951); *Northern Securities Co.* v. *United States*, 193 U. S. 197, 344–351 (1904); cf. *Union Pacific R. Co.* v. *United States*, 313 U. S. 450 (1941) (discussed in n. 19, *supra*). See also n. 44, *supra*.

same time permitting purely parochial interests to disrupt the Nation's free-market goals.

Our Brother STEWART's dissent argues that the result we reach will "greatly . . . impair the ability of a State to delegate governmental power broadly to its municipalities." *Post,* at 438 (footnote omitted). That, with respect, is simply hyperbole. Our decision will render a State no less able to allocate governmental power between itself and its political subdivisions. It means only that when the State itself has not directed or authorized an anticompetitive practice, the State's subdivisions in exercising their delegated power must obey the antitrust laws. The dissent notwithstanding, it is far too late to argue that a State's desire to insulate anticompetitive practices not imposed by it as an act of government falls within the *Parker* doctrine. *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384 (1951). Moreover, by characterizing the *Parker* exemption as fully applicable to local governmental units simply by virtue of their status as such, the approach taken by the dissent would hold anticompetitive municipal action free from federal antitrust enforcement even when state statutes specifically provide that municipalities shall be subject to the antitrust laws of the United States. See generally La. Rev. Stat. Ann. § 33:1334 (G) (West Supp. 1977), quoted in n. 44, *supra.* That result would be a perversion of federalism.[46]

Today's decision does not threaten the legitimate exercise of governmental power, nor does it preclude municipal gov-

---

[46] Restating a theme made and rejected before, see *Cantor* v. *Detroit Edison Co.,* 428 U. S., at 640 (STEWART, J., dissenting), our Brother STEWART's dissent, *post,* at 438–440, likens judicial enforcement of the antitrust laws to a regime of substantive due process used by federal judges to strike down state and municipal economic regulation thought by them unfair. That analogy, of course, ignores the congressional judgment mandating broad scope in enforcement of the antitrust laws and simply reflects the dissent's view that such enforcement with respect to cities is unwise.

ernment from providing services on a monopoly basis. *Parker* and its progeny make clear that a State properly may, as States did in *Parker* and *Bates,* direct or authorize its instrumentalities to act in a way which, if it did not reflect state policy, would be inconsistent with the antitrust laws. Compare *Bates* with *Goldfarb.* True, even a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization. Cf. *Otter Tail Power Co.* v. *United States,* 410 U. S. 366, 377–382 (1973).[47] But assuming that the municipality is authorized to provide a service on a monopoly basis, these limitations on municipal action [48] will not hobble the execution of legitimate governmental programs.

*Affirmed.*

MR. JUSTICE MARSHALL, concurring.

I agree with THE CHIEF JUSTICE, *post,* at 425–426, that any implied "state action" exemption from the antitrust laws should be no broader than is necessary to serve the State's legitimate purposes. I join the plurality opinion, however, because the test there established, relating to whether it is "state policy to displace competition," *ante,* at 413, incorporates within it the core of THE CHIEF JUSTICE's concern. As the plurality opinion makes clear, it is not enough that the State

---

[47] While the majority and dissent disagreed in *Otter Tail* over whether the specific practices of which plaintiffs complained could be regarded as unlawful anticompetitive restraints in light of the existence of federal regulation, there was agreement that a lawful monopolist could violate the antitrust laws. Compare 410 U. S., at 377–382 with *id.,* at 390–391, n. 7 (STEWART, J., concurring in part and dissenting in part).

[48] It may be that certain activities which might appear anticompetitive when engaged in by private parties, take on a different complexion when adopted by a local government. See generally Posner, The Proper Relationship Between State Regulation and the Federal Antitrust Laws, 49 N. Y. U. L. Rev. 693, 705 (1974).

"desire[s] to insulate anticompetitive practices." *Ante,* at 416. For there to be an antitrust exemption, the State must "impose" the practices "as an act of government." *Ibid.* State action involving more anticompetitive restraint than necessary to effectuate governmental purposes must be viewed as inconsistent with the plurality's approach.

MR. CHIEF JUSTICE BURGER, concurring in the Court's opinion in Part I and in the judgment.

This case turns, or ought to, on the District Court's explicit conclusion,[1] unchallenged here, that "[t]hese plaintiff cities are engaging in what is clearly a business activity; activity in which a profit is realized." There is nothing in *Parker* v. *Brown,* 317 U. S. 341 (1943), or its progeny, which suggests that a proprietary enterprise with the inherent capacity for economically disruptive anticompetitive effects should be exempt from the Sherman Act merely because it is organized under state law as a municipality. *Parker* was a case involving a suit against state officials who were administering a state program which had the conceded purpose of replacing competition in a segment of the agricultural market with a regime of governmental regulation. The instant lawsuit is entirely different. It arises because respondent took the perfectly natural step of answering a federal antitrust complaint—

---

[1] The District Court did not, of course, make a formal finding of fact to this effect since the counterclaim was disposed of on the basis of pleadings. Nonetheless, the District Court could reasonably conclude, as a matter of law, that these Cities are engaging in business activities which have as their aim the production of revenues in excess of costs. It certainly is the case that the Cities are attempting to provide a public service, but it is likewise undeniable that they seek to do so in the most profitable way. The Cities allege in their complaint, for, example, that they have "been prevented from profitably expanding their businesses." App. 14. While it is correct that the Cities are ordinarily constrained from applying their net earnings as a private corporation would, this does not detract from their competitive posture and resulting incentive to engage in anticompetitive practices.

filed by competitors—with a counterclaim alleging serious violations of the Sherman Act.

There is nothing in this record to support any assumption other than that this is an ordinary dispute among competitors in the same market. It is true that petitioners are municipalities, but we should not ignore the reality that this is the only difference between the Cities and any other entrepreneur in the economic community. Indeed, the injuries alleged in petitioners' complaint read as a litany of economic woes suffered by a business which has been unfairly treated by a competitor:

> "As a direct and proximate result of the unlawful conduct hereinabove alleged, plaintiffs have: (1) been prevented from and continue to be prevented from *profitably expanding their businesses;* (2) *lost and continue to lose the profits* which would have resulted from the operation of an expanded, *more efficient and lower cost business;* (3) been deprived of and continue to be deprived of economies in the financing and operation of their systems; (4) *sustained and continue to sustain losses in the value of their businesses and properties;* and (5) incurred and continue to incur excessive costs and expenses they otherwise would not have incurred." App. 14. (Emphasis added.)

It strikes me as somewhat remarkable to suggest that the same Congress which "meant to deal comprehensively and effectively with the evils resulting from contracts, combinations and conspiracies in restraint of trade," *Atlantic Cleaner & Dyers, Inc.* v. *United States,* 286 U. S. 427, 435 (1932), would have allowed these petitioners to complain of such economic damage while baldly asserting that any similar harms they might unleash upon competitors or the economy are absolutely beyond the purview of federal law. To allow the defense asserted by the petitioners in this case would inject a wholly arbitrary variable into a "fundamental national economic pol-

icy," *Carnation Co.* v. *Pacific Conference,* 383 U. S. 213, 218 (1966), which strongly disfavors immunity from its scope. See *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 350–351 (1963); *California* v. *FPC,* 369 U. S. 482, 485 (1962).

As I indicated, concurring in *Cantor* v. *Detroit Edison Co.,* 428 U. S. 579, 604 (1976), "in interpreting *Parker,* the Court has heretofore focused on the challenged *activity,* not upon the identity of the *parties* to the suit." Such an approach is surely logical in light of the fact that the Congress which passed the Sherman Act very likely never considered the kinds of problems generated by *Parker* and the cases which have arisen in its wake. *E. g., Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977); *Cantor, supra; Goldfarb* v. *Virginia State Bar,* 421 U. S. 773 (1975); see Slater, Antitrust and Government Action: A Formula for Narrowing *Parker* v. *Brown,* 69 Nw. U. L. Rev. 71, 84 (1974). It is even more dubious to assume that the Congress specifically focused its attention on the possible liability of a utility operated by a subdivision of a State. Not only were the States generally considered free to regulate commerce within their own borders, see, *e. g., United States* v. *E. C. Knight Co.,* 156 U. S. 1 (1895); *Kidd* v. *Pearson,* 128 U. S. 1 (1888), but manufacturing enterprises, in and of themselves, were not taken to be interstate commerce. *Id.,* at 20.

By the time *Parker* was decided, however, this narrow view of "interstate commerce" had broadened via the "affection doctrine" to include intrastate events which had a sufficient effect on interstate commerce. See *NLRB* v. *Fainblatt,* 306 U. S. 601, 605, and n. 1 (1939); cf. *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S. 738, 743 (1976). Given this development, and the Court's interpretation of "person" or "persons" in the Sherman Act to include States and municipalities, *ante,* at 394–397, along with the trend of allowing the reach of the Sherman Act to expand with broadening conceptions of congressional power under the Commerce Clause, see

*Rex Hospital Trustees, supra,* at 743 n. 2, one might reasonably wonder how the Court reached its result in *Parker.*

The holding in *Parker* is perfectly understandable, though, in light of the historical period in which the case was decided. The Court had then but recently emerged from the era of substantive due process, and was undoubtedly not eager to commence a new round of invalidating state regulatory laws on federal principles. See Verkuil, State Action, Due Process and Antitrust: Reflections on *Parker* v. *Brown,* 75 Colum. L. Rev. 328, 331–334 (1975). Responding to this concern, the *Parker* Court's interpretation of legislative intent reflects a "polic[y] of signal importance in our national traditions and governmental structure of federalism." *Ante,* at 400.

> "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker,* 317 U. S., at 351.

The *Parker* decision was thus firmly grounded on principles of federalism, the ambit of its inquiry into congressional purpose being defined by the Court's view of the requirements of "a dual system of government." [2]

This mode of analysis is as sound today as it was then, and I am surprised that neither the plurality opinion nor the dissents focus their attention on this aspect of *Parker.* Indeed,

---

[2] Our conceptions of the limits imposed by federalism are bound to evolve, just as our understanding of Congress' power under the Commerce Clause has evolved. Consequently, since we find it appropriate to allow the ambit of the Sherman Act to expand with evolving perceptions of congressional power under the Commerce Clause, a similar process should occur with respect to "state action" analysis under *Parker.* That is, we should not treat the *result* in the *Parker* case as cast in bronze; rather, the scope of the Sherman Act's power should parallel the developing concepts of American federalism.

it is even more puzzling that so much judicial energy is expended here on deciding a question not presented by the parties or by the facts of this case: that is, to what extent the Sherman Act impinges generally upon the monopoly powers of state and local governments. As I suggested at the outset, the issue here is whether the Sherman Act reaches the proprietary enterprises of municipalities.[3]

The answer to the question presented ought not to be so difficult. When *Parker* was decided there was certainly no question that a State's operation of a common carrier, even without profit and as a "public function," would be subject to federal regulation under the Commerce Clause. *United States* v. *California,* 297 U. S. 175, 183–186 (1936) ("[W]e think it unimportant to say whether the state conducts its railroad in its 'sovereign' or in its 'private' capacity." *Id.,* at 183); see *Parden* v. *Terminal R. Co.,* 377 U. S. 184, 189–193 (1964); *California* v. *Taylor,* 353 U. S. 553, 568 (1957). Likewise, it had been held in *Ohio* v. *Helvering,* 292 U. S. 360 (1934), that a State, upon engaging in business, became subject to a federal statute imposing a tax on those dealing in intoxicating liquors, although States were not specifically mentioned in the statute. In short, the Court had already recognized, for purposes of federalism, the difference between a State's entrepreneurial personality and a sovereign's decision— as in *Parker*—to replace competition with regulation.[4]

---

[3] I use the term "proprietary" only to focus attention on the fact that all of the parties are in a competitive relationship such that each should be constrained, when necessary, by the federal antitrust laws. It is highly unlikely that Congress would have meant to impose liability only on some of these parties, when each possesses the means to thwart federal antitrust policy.

[4] Mr. Justice Stewart's dissent, *post,* at 433–434, attempts to blunt this analysis by noting that the "nongovernmental-governmental" distinction was criticized in *Indian Towing Co.* v. *United States,* 350 U. S. 61 (1955). I suggest no more, however, than what is obvious from our past cases: Petitioners' business activities are not entitled to *per se* exemption from the

I see nothing in the last 35 years to question this conclusion. In fact, the Court's recent decision in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), which rekindled a commitment to tempering the Commerce Clause power with the limits imposed by our structure of government, employs language strikingly similar to the words of Mr. Chief Justice Stone in *Parker:*

> "It is one thing to recognize the authority of Congress to enact laws regulating individual businesses necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside. It is quite another to uphold a similar exercise of congressional authority directed, not to private citizens, but to States as States. We have repeatedly recognized that there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner." 426 U. S., at 845.

The *National League of Cities* opinion focused its delineation of the "attributes of sovereignty" alluded to above on a determination as to whether the State's interest involved " 'functions essential to separate and independent existence.' " *Ibid.,*

---

Sherman Act. This much ought to be quite clear from *United States* v. *California,* 297 U. S. 175 (1936), where the State operated a railroad, albeit without profit, and as a "public function." I cannot comprehend why the Cities here should be treated in a different manner. The only authority which MR. JUSTICE STEWART cites to the contrary, *Lowenstein* v. *Evans,* 69 F. 908 (CC SC 1895), was a case in which a State's complete monopolization of the liquor industry was challenged as violating the Sherman Act. But in that circumstance the State clearly *directed* the creation of a monopoly, thus bringing the matter within the *Parker* rationale. Compare *Ohio* v. *Helvering,* 292 U. S. 360 (1934).

quoting *Coyle* v. *Oklahoma,* 221 U. S. 559, 580 (1911). It should be evident, I would think, that the running of a business enterprise is not an integral operation in the area of traditional government functions. See *Alfred Dunhill of London, Inc.* v. *Cuba,* 425 U. S. 682, 695–696 (1976); *Bank of United States* v. *Planters' Bank of Georgia,* 9 Wheat. 904, 907 (1824). Indeed, the reaffirmance of the holding in *United States* v. *California, supra,* by *National League of Cities, supra,* at 854 n. 18, strongly supports this understanding. Even if this proposition were not generally true, the particular undertaking at issue here—the supplying of electric service—has not traditionally been the prerogative of the State. *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345, 352–353 (1974).[5]

Following the path outlined above should lead us to a logical destination: Petitioners should be treated, for purposes of applying the federal antitrust laws, in essentially the same manner as respondent. This is not to say, of course, that the conduct in which petitioners allegedly engaged is automatically subject to condemnation under the Sherman Act. As the Court recognized in *Cantor* v. *Detroit Edison Co.,* 428 U. S., at 592–598, state-regulated utilities pose special analytical problems under *Parker.* It may very well be, for example, that a State, acting as sovereign, has imposed a system of governmental control in order "to avoid the consequences of unre-

---

[5] Such an ascertainment dovetails precisely with the law of Louisiana. There it is recognized that the powers of a municipal corporation are both public and private: As to the former, the city represents the State, discharging duties incumbent upon the State; as to the latter, it represents pecuniary and proprietary interests of individuals, and is held to the same responsibility as a private person. *Hall* v. *Shreveport,* 157 La. 589, 594, 102 So. 680, 681 (1925). A long line of Louisiana cases dealing explicitly with the subject of municipally owned electrical utilities holds that cities are to be governed by the same rules applicable to private corporations and individuals. See *Hicks* v. *City of Monroe Utilities Comm'n,* 237 La. 848, 112 So. 2d 635 (1959); *Elias* v. *Mayor of New Iberia,* 137 La. 691, 69 So. 141 (1915); *Hart* v. *Lake Providence,* 5 La. App. 294 (1926); *Bannister* v. *City of Monroe,* 4 La. App. 182 (1926).

strained competition." *Cantor, supra,* at 595. This is precisely what occurred in *Parker,* and there is no question that a utility's action taken pursuant to the command of such an "act of government," *Parker,* 317 U. S., at 352, would not be prohibited by the Sherman Act.

I agree with the plurality, then, that "[t]he *threshold inquiry* in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the *activity* is required by the State acting as sovereign." *Goldfarb,* 421 U. S., at 790. (Emphasis added.) But this is only the first, not the final step of the inquiry, for *Cantor* recognized that "all economic regulation does not necessarily suppress competition." 428 U. S., at 595. "There is no logical inconsistency between requiring such a firm to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." *Id.,* at 596.

I would therefore remand, directing the District Court to take an additional step beyond merely determining—as the plurality would—that any area of conflict between the State's regulatory policies and the federal antitrust laws was the result of a "state policy to displace competition with regulation or monopoly public service."[6] *Ante,* at 413. This supple-

---

[6] While I agree with the plurality that a State may cause certain activities to be exempt from the federal antitrust laws by virtue of an articulated policy to displace competition with regulation, I would require a strong showing on the part of the defendant that the State so intended. Thus, I would not be satisfied, as the plurality and Court of Appeals apparently are, that the highest policymaking body in the State of Louisiana merely "contemplated" the activities being undertaken by the cities. See *ante,* at 415. I would insist, as the Court did in *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 791 (1975), that the State *compel* the anticompetitive activity. Moreover, I would have the Cities demonstrate that the exemption was not only part of a regulatory scheme to supersede competition, but that it was *essential* to the State's plan. Consequently,

mental inquiry would consist of determining whether the implied exemption from federal law "was necessary in order to make the regulatory Act work, 'and even then only to the minimum extent necessary.'" 428 U. S., at 597.[7]

MR. JUSTICE STEWART, with whom MR. JUSTICE WHITE, MR. JUSTICE BLACKMUN,* and MR. JUSTICE REHNQUIST join, dissenting.

In *Parker* v. *Brown,* 317 U. S. 341, a California statute restricted competition among raisin growers in order to keep the price of raisins artificially high. The Court found that California's program did not violate the antitrust laws but was "an act of government which the Sherman Act did not undertake to prohibit." *Id.,* at 352. *Parker* v. *Brown* thus made clear that "where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." *Eastern Railroad Presidents Conf.* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127, 136.

The principle of *Parker* v. *Brown* controls this case. The petitioners are governmental bodies, not private persons, and their actions are "act[s] of government" which *Parker* v. *Brown* held are not subject to the Sherman Act. But instead of applying the *Parker* doctrine, the Court today imposes new

---

I do not disagree with the terms of the plurality's remand *as such;* I would simply ask for a stronger showing on the part of the Cities. I join the judgment, however, and the directions of the remand, because they represent at a minimum what I believe we should demand of petitioners.

[7] In *Cantor* this mode of analysis effectively answered Detroit Edison's claim that it was required by state law to engage in the allegedly anticompetitive activities. We "infer[red] that the State's policy [was] *neutral* on the question whether a utility should, or should not, have such a program," 428 U. S., at 585 (opinion of STEVENS, J.) (emphasis added), 604–605 (opinion of BURGER, C. J.), and consequently it could not be said that an exemption "was necessary in order to make the regulatory Act work."

*MR. JUSTICE BLACKMUN joins all but Part II–B of this opinion.

and unjustifiable limits upon it. According to the plurality, governmental action will henceforth be immune from the antitrust laws[1] only when "authorized or directed" by the State "pursuant to state policy to displace competition with regulation or monopoly public service." *Ante,* at 414, 413. Such a "direction" from the State apparently will exist only when it can be shown " 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.' " *Ante,* at 415. By this exclusive focus on a legislative mandate the plurality has effectively limited the governmental action immunity of the *Parker* case to the acts of a state legislature. This is a sharp and I think unjustifiable departure from our prior cases.

THE CHIEF JUSTICE adopts a different approach, at once broader and narrower than the plurality's. In his view, municipalities are subject to antitrust liability when they engage in "proprietary enterprises," *ante,* at 422, but apparently retain their antitrust immunity for other types of activity. But a city engaged in proprietary activity is to be treated as if it were a private corporation: that is, it is immune from the antitrust laws only if it shows not merely that its action was " 'required by the State acting as sovereign' " but also that such immunity is " 'necessary in order to make the [State's] regulatory Act work.' " *Ante,* at 425, 426. THE CHIEF JUSTICE'S approach seems to me just as mistaken as the plurality's.

---

[1] As the plurality acknowledges, *ante,* at 393 n. 8, *Parker* v. *Brown* did not create any exemption from the antitrust laws, but simply recognized that it was the intent of Congress that the Sherman Act should not apply to governmental action. It is thus hard to understand why the plurality invokes the doctrine that exemptions from the antitrust laws will not be lightly implied by subsequent enactment of a regulatory statute. This rule, which effects the accommodation of two federal statutes and rests on the principle that implied repeals are not favored, has no relevance to the *Parker* doctrine, which is based on an interpretation of the Sherman Act itself.

428

I

The fundamental error in the opinions of the plurality and THE CHIEF JUSTICE is their failure to recognize the difference between private activities authorized or regulated by government on the one hand, and the actions of government itself on the other.

A

In determining whether the actions of a political subdivision of a State as well as those of a state legislature are immune from the Sherman Act, we must interpret the provisions of the Act "in the light of its legislative history and of the particular evils at which the legislation was aimed." *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 489. Those "particular evils" did not include acts of governmental bodies. Rather, Congress was concerned with attacking concentrations of private economic power unresponsive to public needs, such as "these great trusts, these great corporations, these large moneyed institutions." 21 Cong. Rec. 2562 (1890).[2]

Recognizing this congressional intent, the Court in *Parker* v. *Brown* held that the antitrust laws apply to private and not governmental action. The program there at issue was in

---

[2] See also, *e. g.,* 20 Cong. Rec. 1458 (1889) ("the practice, now becoming too common, of large corporations, and of single persons, too, of large wealth, so arranging that they dictate to the people of this country what they shall pay when they purchase, and what they shall receive when they sell"); 21 Cong. Rec. 2728 (1890) ("transaction[s] the only purpose of which is to extort from the community, monopolize, segregate, and apply to individual use, for the purposes of individual greed, wealth which ought properly and lawfully and for the public interest to be generally diffused over the whole community"); *id.,* at 3147 (remarks of Sen. George).

That the Sherman Act was enacted to deal with combinations of individuals and corporations for private business advantage has long been recognized by this Court. *Eastern Railroad Presidents Conf.* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127, 135–136; *Apex Hosiery Co.* v. *Leader,* 310 U. S., at 492–493, and n. 15; *Standard Oil Co.* v. *United States,* 221 U. S. 1, 50, 58.

fact established by California's legislature, and not by one of its political subdivisions. But the Court nowhere held that the actions of municipal governments should not equally be immune from the antitrust laws. On the contrary, it expressly equated "the state or its municipality." 317 U. S., at 351. The *Parker* opinion repeatedly and carefully [3] emphasized that California's program was not the action of "private persons, individual or corporate." *Id.*, at 350.[4] The distinction established in *Parker* v. *Brown* was not one between actions of a state legislature and those of other governmental units. Rather, the Court drew the line between private action and governmental action.

There can be no doubt on which side of this line the petitioners' actions fall. "Municipal corporations are instrumentalities of the State for the convenient administration of government within their limits." *Louisiana ex rel. Folsom* v. *Mayor of New Orleans*, 109 U. S. 285, 287; cf. *Reynolds* v. *Sims*, 377 U. S. 533, 575.[5] They have only such powers as are delegated them by the State of which they are a subdivision, and when they act they exercise the State's sovereign power. *Avery* v. *Midland County*, 390 U. S. 474, 480; *Breard* v.

---

[3] See *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 591, and n. 24.

[4] The Court assumed that California's program would violate the Sherman Act "if it were organized and made effective solely by virtue of a contract, combination or conspiracy of private persons, individual or corporate," but noted that the program "was never intended to operate by force of individual agreement or combination." 317 U. S., at 350. The Court found nothing in the Sherman Act or its legislative history to suggest that "it was intended to restrain state action or official action directed by a state"; rather, the Act was intended "to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations." *Id.*, at 351. It was "a prohibition of individual and not state action." *Id.*, at 352.

[5] See also, *e. g.*, *Trenton* v. *New Jersey*, 262 U. S. 182, 185–186; *Hunter* v. *Pittsburgh*, 207 U. S. 161, 178; *The Mayor* v. *Ray*, 19 Wall. 468, 475; *Bradford* v. *Shreveport*, 305 So. 2d 487 (La.).

*Alexandria,* 341 U. S. 622, 640. City governments are not unaccountable to the public but are subject to direct popular control through their own electorates and through the state legislature.[6] They are thus a far cry from the private accumulations of wealth that the Sherman Act was intended to regulate.

## B

The plurality today advances two reasons for holding nonetheless that the *Parker* doctrine is inapplicable to municipal governments. First, the plurality notes that municipalities cannot claim the State's sovereign immunity under the Eleventh Amendment. *Ante,* at 412. But this is hardly relevant to the question of whether they are within the reach of the Sherman Act. That question must be answered by reference to congressional intent, and not constitutional principles that apply in entirely different situations.[7] And if constitutional analogies are to be looked to, a decision much more directly related to this case than those under the Eleventh Amendment is *National League of Cities* v. *Usery,* 426 U. S. 833. That case, like this one, involved an exercise of Congress' power under the Commerce Clause, and held that States and their political subdivisions must be given equal deference. *Id.,* at 855–856, n. 20. The plurality does not advance any basis for its disregard of *National League of Cities* and its

---

[6] Cf. *Barnes* v. *District of Columbia,* 91 U. S. 540, 544–545; *The Mayor* v. *Ray, supra,* at 475; *East Hartford* v. *Hartford Bridge Co.,* 10 How. 511. Under Louisiana law the petitioners' powers are subject to complete legislative control. See *Bradford* v. *Shreveport, supra.*

[7] That the particular factual and legal context is all important is shown by the fact that under other provisions of the Constitution a municipality is equated with a State. *E. g., Waller* v. *Florida,* 397 U. S. 387 (Double Jeopardy Clause); *Avery* v. *Midland County,* 390 U. S. 474, 480 (Fourteenth Amendment); *Trenton* v. *New Jersey, supra* (Impairment of Contract Clause). See also *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 927 n. 2 (28 U. S. C. § 1254 (2)).

reliance instead on the basically irrelevant body of law under the Eleventh Amendment.

Secondly, the plurality relies on *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773. The *Goldfarb* case, however, did not overrule *Parker* v. *Brown* but rather applied it. *Goldfarb* concerned a scheme regulating economic competition among private parties, namely, lawyers. The Court held that this "private anticompetitive activity," 421 U. S., at 792, could not be sheltered under the umbrella of the *Parker* doctrine unless it was compelled by the State. Since the bar association and State Bar could show no more than that their minimum-fee schedule "complemented" actions of the State, *id.,* at 791, the scheme was not immune from the antitrust laws. Cf. *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384.

Unlike *Goldfarb,* this case does not involve any anticompetitive activity by private persons. As noted in *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 361, actions of governmental bodies themselves present "an entirely different case" falling squarely within the rule of *Parker* v. *Brown.* Although the State Bar in *Goldfarb* was "a state agency for some limited purposes," 421 U. S., at 791, the price fixing it fostered was for the private benefit of its members and its actions were essentially those of a private professional group. Cf. *Asheville Tobacco Board of Trade, Inc.* v. *FTC,* 263 F. 2d 502, 508–510 (CA4). Unlike a city, the Virginia State Bar surely is not "a political subdivision of the State." [8]

By requiring that a city show a legislative mandate for its activity, the plurality today blurs, if indeed it does not erase, this logical distinction between private and governmental action. In *Goldfarb* and in *Cantor* v. *Detroit Edison Co.,* 428 U. S. 579, the Court held that *private* action must be *compelled* by the state legislature in order to escape the reach of the Sherman Act. State compulsion is an appropriate require-

---

[8] *Worcester* v. *Street R. Co.,* 196 U. S. 539, 548.

ment when private persons claim that their anticompetitive actions are not their own but the State's, since a State cannot immunize private anticompetitive conduct merely by permitting it.[9] But it is senseless to require a showing of state compulsion when the State itself acts through one of its governmental subdivisions. See *New Mexico* v. *American Petrofina, Inc.,* 501 F. 2d 363, 369–370 (CA9).

## C

The separate opinion of THE CHIEF JUSTICE does not rely on any distinctions between States and their political subdivisions. It purports to find a simpler reason for subjecting the petitioners to antitrust liability despite the fact that they are governmental bodies, namely, that *Parker* v. *Brown* does not protect "a State's entrepreneurial personality." *Ante,* at 422.[10] But this distinction is no more substantial a basis for disregarding the governmental action immunity in this case than the reasons advanced by the plurality.

A State may choose to regulate private persons providing certain goods or services, or it may provide the goods and services itself. The State's regulatory body in the former case, or a state-owned utility in the latter, will necessarily make economic decisions. These decisions may be responsive to similar concerns, and they may have similar anticompetitive effects.[11] Yet, according to THE CHIEF JUSTICE, the former

---

[9] See *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 346.

[10] However, the District Court's "conclusion," *ante,* at 418, that the petitioners' electric utility service was a business activity engaged in for profit was not supported by any evidence (since the case was decided on a motion to dismiss) and is indeed challenged here by the petitioners in their reply brief.

[11] Of course, the fact—heavily relied upon both by the plurality and THE CHIEF JUSTICE—that the actions of cities may have anticompetitive effects misses the point. The whole issue before the Court today is whether conduct that would concededly subject a private individual to liability

type of governmental decision is immune from antitrust liability while the latter is not.

There is no basis for this distinction either in the Sherman Act itself or in our prior cases interpreting it. To the contrary, *Parker* v. *Brown* established that governmental actions are not regulated by the Sherman Act. See *supra*, at 428–430. And, as this Court has previously said:

> " 'Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it.' *Federal Crop Insurance Corp.* v. *Merrill*, 332 U. S. 380, 383–384. On the other hand, it is hard to think of any governmental activity on the 'operational level,' our present concern, which is 'uniquely governmental,' in the sense that its kind has not at one time or another been, or could not conceivably be, privately performed." *Indian Towing Co.* v. *United States*, 350 U. S. 61, 67–68.

Nonetheless THE CHIEF JUSTICE would treat some governmental actions as governmental for purposes of the antitrust laws, and some as if they were not governmental at all.

Moreover, the scope of the immunity envisioned by THE CHIEF JUSTICE is virtually impossible to determine. The distinction between "proprietary" and "governmental" activities has aptly been described as a "quagmire." *Id.*, at 65. The "distinctions [are] so finespun and capricious as to be almost incapable of being held in the mind for adequate formulation." *Id.*, at 65–68. The separate opinion of THE CHIEF JUSTICE does nothing to make these distinctions any more substantial or understandable.[12] Indeed, even a mo-

---

because of its anticompetitive nature is proscribed by the antitrust laws when undertaken by a city.

[12] In various places, the separate opinion of THE CHIEF JUSTICE refers to " 'business activit[ies] . . . in which a profit is realized,' " to "pro-

ment's consideration of the range of services provided today by governments shows how difficult it is to determine whether or not they are "proprietary." For example, if a city or State decides to provide water service to its citizens at cost on a monopoly basis, is its action to be characterized as "proprietary"? Whether it is "proprietary" or not, it is surely an act of government, as are the petitioners' actions in this case. Cf. *Lowenstein* v. *Evans,* 69 F. 908 (CC S. C.).[13] But THE CHIEF JUSTICE, like the plurality, ignores what seems to me the controlling distinction in this case, that between private and governmental action.

## II

The Court's decision in this case marks an extraordinary intrusion into the operation of state and local government in this country. Its impact can hardly be overstated.

## A

Under our federal system, a State is generally free to allocate its governmental power to its political subdivisions as it wishes.[14] A State may decide to permit its municipalities to exercise its police power without having to obtain approval of each law from the legislature.[15] Such local self-government

---

prietary enterprises," to activities which have "the inherent capacity for economically disruptive anticompetitive effects," to those which are not "integral operation[s] in the area of traditional government functions," and to those not "the prerogative of the State."

[13] This case, involving a state liquor monopoly, was cited with approval in *Parker* v. *Brown,* 317 U. S., at 352.

[14] See, *e. g., Lockport* v. *Citizens for Community Action,* 430 U. S. 259, 269; *Avery* v. *Midland County,* 390 U. S., at 481–482.

[15] Local self-government is broadest in "home rule" municipalities, which can be almost entirely free from legislative control in local matters. See Vanlandingham, Municipal Home Rule in the United States, 10 Wm. & Mary L. Rev. 269 (1968). Although the petitioners are not home rule cities, Louisiana's Constitution has a home rule provision, La. Const. of 1974, Art. 6, §§ 5, 6; La. Const. of 1921, Art. XIV, §§ 22, 40 (c), as

serves important state interests. It allows a state legislature to devote more time to statewide problems without being burdened with purely local matters, and allows municipalities to deal quickly and flexibly with local problems. But today's decision, by demanding extensive legislative control over municipal action, will necessarily diminish the extent to which a State can share its power with autonomous local governmental bodies.

This will follow from the plurality's emphasis on state legislative action, and the vagueness of the criteria it announces.[16] First, it is not clear from the plurality opinion whether a municipal government's actions will be immune from the Sherman Act if they are merely "authorized" by a state legislature or whether they must be legislatively "directed" in order to enjoy immunity. While the plurality uses these terms interchangeably, they can have very different meanings. See *Cantor* v. *Detroit Edison Co.*, 428 U. S., at 592–593. A municipality that is merely "authorized" by a state statute to provide a monopoly service thus cannot be certain it will not be subject to antitrust liability if it does so.

Second, the plurality gives no indication of how specifically the legislature's "direction" must relate to the "action complained of." Reference to the facts of this case will show how elusive the plurality's test is. Stripped to its essentials, the counterclaim alleged that the petitioners engaged in sham litigation, maintained their monopolies by debenture covenants, foreclosed competition by long-term supply contracts,

---

do the constitutions or statutes of at least 33 other States. Note, Antitrust Law and Municipal Corporations, 65 Geo. L. J. 1547, 1559 n. 77 (1977).

[16] While THE CHIEF JUSTICE has not joined those portions of the plurality opinion that discuss what is necessary to show that a challenged activity was required by the State, he would apparently require a still stronger, and hence less justifiable, showing of state legislative compulsion. *Ante,* at 425–426, n. 6.

and tied the sale of gas and water to the sale of electricity. Broadly speaking, these actions could be characterized as bringing lawsuits, issuing bonds, and providing electric and gas service, all of which are activities authorized by state statutes.[17] But in affirming the judgment of the Court of Appeals the Court makes evident that it does not consider these statutes alone a sufficient "mandate" to the cities.

On the other hand, the plurality states that a city need not "point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit." *Ante,* at 415. Thus, it seems that the petitioners need not identify a statute compelling each lawsuit, each contract, and each debenture covenant.[18] But what intermediate showing

---

[17] La. Rev. Stat. Ann. § 33:621 (West 1951):

"The inhabitants of the city shall continue a body politic and corporate by its present name and, as such, . . . may sue and be sued; . . . may acquire by condemnation or otherwise, construct, own, lease, and operate and regulate public utilities within or without the corporate limits of the city subject only to restrictions imposed by general law for the protection of other communities; . . . [and] may borrow money on the faith and credit of the city by issue or sale of bonds, notes, or other evidences of debt . . . ."

See also La. Rev. Stat. Ann. §§ 33:1326 (West 1951), 33:4162, 33:4163 (West 1966).

[18] The plurality's suggestion that the Louisiana Legislature has expressed a state policy that the activities of cities should be subject to the antitrust laws, *ante,* at 414–415, n. 44, and 416, is both erroneous and irrelevant. Louisiana Rev. Stat. Ann. § 33:1334 (G) (West Supp. 1977) applies not to municipalities but only to utility commissions created jointly by several cities or counties; there is no comparable statute applicable to the petitioners. Moreover, the applicability of the federal antitrust laws is a matter of federal, not state, law; conversely, a State's restrictions on municipal action are a matter of state, not federal, law. A State can no more bring a person's conduct within the coverage of federal law when Congress has not done so than it can exempt a person's conduct from the operation of federal law if Congress has provided otherwise. Cf. *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384.

of legislative authorization, approval, or command will meet the plurality's test I am unable to fathom.[19]

Finally, state statutes often are enacted with little recorded legislative history,[20] and the bare words of a statute will often be unilluminating in interpreting legislative intent. For example, do the Louisiana statutes permitting the petitioners to operate public utilities [21] "contemplate" that the petitioners might tie the sale of gas to the sale of electricity? Do those statutes, indeed, "contemplate" that electric service will be provided to city residents on a monopoly basis? Without legislative history or relevant statutory language, any answer to these questions would be purely a creation of judicial imagination.[22]

---

[19] The Court imposes yet another unwarranted limitation upon governmental immunity from the antitrust laws. Apparently, a municipality can claim immunity only if the state legislature has mandated its action "pursuant to state policy to displace competition with regulation or monopoly public service." *Ante,* at 413 (plurality opinion); see *ante,* at 425 (opinion of BURGER, C. J.). Even had the Louisiana State Legislature passed a law specifically compelling the petitioners to litigate in an effort to prevent respondent from constructing its nuclear generating facility, compelling them to insert restrictive covenants in their debentures, and compelling the tying arrangements complained of, could such a law fairly be described as "displac[ing] competition with regulation or monopoly public service"? Would the Court thus deny the cities immunity for their actions even if they were compelled by the State which controlled them?

[20] See M. Price & H. Bitner, Effective Legal Research 73, 103 (3d ed. 1969).

[21] See n. 17, *supra.*

[22] This problem of statutory interpretation is exacerbated by the fact that today's decision will have "retroactive" application in two senses. First, antitrust liability can be premised on actions that have occurred in the past. Second, many of the statutes governing contemporary and future municipal activities were enacted years ago. Thus, municipalities will be faced with the difficult problem of establishing their antitrust immunity based on statutes that were enacted without any foreknowledge of the criteria announced by the Court today.

As a practical result of the uncertainties in today's opinions,[23] and of the plurality's emphasis on state legislative action, a prudent municipality will probably believe itself compelled to seek passage of a state statute requiring it to engage in any activity which might be considered anticompetitive. Each time a city grants an exclusive franchise, or chooses to provide a service itself on a monopoly basis, or refuses to grant a zoning variance to a business,[24] or even—as alleged in this case—brings litigation on behalf of its citizens, state legislative action will be necessary to ensure that a federal court will not subsequently decide that the activity was not "contemplated" by the legislature. Thus, the effect of today's decision is greatly to impair the ability of a State to delegate governmental power broadly to its municipalities.[25] Such extensive interference with the fundamentals of state government is not a proper function of the federal judiciary.[26]

## B

Today's decision will cause excessive judicial interference not only with the procedures by which a State makes its governmental decisions, but with their substance as well.

---

[23] The vagueness of the test proposed in the separate opinion of THE CHIEF JUSTICE, see *supra*, at 433–434, will only add to the confusion of a city trying to protect itself from antitrust liability.

[24] See *Whitworth* v. *Perkins*, 559 F. 2d 378 (CA5).

[25] By imposing antitrust liability on "proprietary" governmental activities, the test adopted in the opinion of THE CHIEF JUSTICE would further deter States from choosing to provide services themselves rather than regulating others.

[26] See *Sailors* v. *Board of Education*, 387 U. S. 105; *Williams* v. *Eggleston*, 170 U. S. 304, 310; see also *Baker* v. *Carr*, 369 U. S. 186, 289–290, and n. 23, and cases cited (Frankfurter, J., dissenting).

The plurality's emphasis on legislative action also leaves in doubt the status of state delegations of power to administrative agencies, unless they, too, can show that the legislature "directed" their actions. This, of course, defeats the whole purpose of establishing such agencies.

States should be "accorded wide latitude in the regulation of their local economies," *New Orleans* v. *Dukes,* 427 U. S. 297, 303, and in "the manner in which they will structure delivery of those governmental services which their citizens require." *National League of Cities* v. *Usery,* 426 U. S., at 847. The antitrust liability the Court today imposes on municipal governments will sharply limit that latitude.

First, the very vagueness and uncertainty of the new test for antitrust immunity is bound to discourage state agencies and subdivisions in their experimentation with innovative social and economic programs.[27]   In the exercise of their powers local governmental entities often take actions that might violate the antitrust laws if taken by private persons, such as granting exclusive franchises, enacting restrictive zoning ordinances, and providing public services on a monopoly basis.   But a city contemplating such action in the interest of its citizens will be able to do so after today only at the risk of discovering too late that a federal court believes that insufficient statutory "direction" existed, or that the activity is "proprietary" in nature.

Second, the imposition of antitrust liability on the activities of municipal governments will allow the sort of wide-ranging inquiry into the reasonableness of state regulations that this Court has forsworn.[28]   For example, in *New Orleans* v. *Dukes, supra,* a city ordinance which, to preserve the character of a historic area, prohibited the sale of food from pushcarts unless the vendor had been in business for at least eight years, was challenged under the Equal Protection Clause of the Fourteenth Amendment.   The Court upheld the constitutional validity of the ordinance.   But it now appears that if Dukes had proceeded under the antitrust laws and claimed that the ordinance was an unreasonably anticompetitive limit

---

[27] See *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (Brandeis, J., dissenting).

[28] *Ferguson* v. *Skrupa,* 372 U. S. 726.

on the number of pushcart vendors, he might well have prevailed unless New Orleans could establish that the Louisiana Legislature "contemplated" the exclusion of all but a few pushcart vendors from the historic area. The "wide latitude" of the States "in the regulation of their local economies," exercised in *Dukes* by the city to which this power to regulate had been delegated, could thus be wholly stifled by the application of the antitrust laws.

## C

Finally, today's decision will impose staggering costs on the thousands of municipal governments in our country. In this case, a not atypical antitrust action, the respondent claimed that it had suffered damages of $180 million as a result of only one of the antitrust violations it alleged. Trebled, this amounts to $540 million on this claim alone, to be recovered from cities with a combined population (in 1970) of about 75,000.[29] A judgment of this magnitude would assure bankruptcy for almost any municipality against which it might be rendered.[30] Even if the petitioners ultimately prevail, their citizens will have to bear the rapidly mounting

---

[29] U. S. Department of Commerce, Bureau of the Census, 1970 Census of Population, Number of Inhabitants, United States Summary, Table 31 (1971).

[30] The Court indicates that the remedy of treble damages might not be "appropriate" in antitrust actions against a municipality. *Ante,* at 401–402, and n. 22. But the language of § 4 of the Clayton Act, 15 U. S. C. § 15 (1976 ed.), is mandatory on its face: It requires that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . *shall* recover threefold the damages by him sustained" (emphasis supplied). Cf., *e. g.,* 35 U. S. C. § 284. And the legislative history cited by MR. JUSTICE BLACKMUN, *post,* at 443 n. 2, demonstrates that Congress has understood the treble-damages provision to be mandatory and has refused to change it. The Court does not say on what basis a district court could possibly disregard this clear statutory command. Cf. *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134.

costs of antitrust litigation through increased taxes or decreased services.[31] The prospect of a city closing its schools, discharging its policemen, and curtailing its fire department in order to defend an antitrust suit would surely dismay the Congress that enacted the Sherman Act.[32]

For all of the reasons discussed in this opinion, I respectfully dissent.

MR. JUSTICE BLACKMUN, dissenting.

I join MR. JUSTICE STEWART's dissent with the exception of Part II–B, but wish to note that I do not take his opinion as reaching the question whether petitioners should be immune under the Sherman Act even if found to have been acting in concert with private parties. To grant immunity to municipalities in such a circumstance would go beyond the protections previously accorded officials of the States themselves. See *Parker* v. *Brown,* 317 U. S. 341, 351–352 (1943) ("[W]e have no question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade, cf. *Union Pacific R. Co.* v. *United States,* 313 U. S. 450"). The Court of Appeals did not have the opportunity to rule on how a "conspiracy with private parties" exception to municipalities' general immunity should be limited, if indeed such an exception is appropriate at all. If the view that municipalities are not subject to the full reach

---

[31] Legal fees to defend one current antitrust suit have been estimated as at least one-half million dollars a month. N. Y. Times, June 27, 1977, p. 41, col. 6; *id.,* Sept. 4, 1977, section 3, p. 5, col. 1.

[32] Treble-damages liability can, of course, be ruinous to a private corporation as well. But a private corporation, organized for the purpose of seeking private profit, is surely very different from a city providing essential governmental functions, and shareholders do not stand in the same relation to their corporation as do residents or taxpayers to the city in which they live. An investment in a corporation is essentially a business decision; a shareholder takes the risks of corporate losses in the hope of corporate profits. A citizen's relationship to his city government is obviously far different.

of Sherman Act liability had commanded a majority, a remand for consideration of this more limited exception would be in order.

In light of the fact that the plurality and THE CHIEF JUSTICE have concluded that municipalities should be subject to broad Sherman Act liability, I must question the nonchalance with which the Court puts aside the question of remedy. *Ante,* at 402, and n. 22. It is a grave act to make governmental units potentially liable for massive treble damages when, however "proprietary" some of their activities may seem, they have fundamental responsibilities to their citizens for the provision of life-sustaining services such as police and fire protection. The several occasions in the past when the Court has found that Congress intended to subject municipalities and States to liability as "persons" or "corporations" do not provide the support for today's holding that the plurality opinion would pretend. *Ante,* at 400–402, and nn. 19–21. The Court cites previous constructions of the Elkins Act; the federal tax on sellers of alcoholic beverages; and the Shipping Act, 1916. But the financial penalties available under those Acts do not even approach the magnitude of the treble-damages remedy provided by the antitrust laws.[1] Nor has

---

[1] Respondent seeks treble damages in excess of $540 million in this case. If divided among Plaquemine and Lafayette residents, that penalty would exceed $28,000 for each family of four.

Under the federal tax on sellers of alcoholic beverages, 26 U. S. C. §§ 11 and 205 (1926 ed.), construed in *Ohio* v. *Helvering,* 292 U. S. 360, 370–371 (1934), the potential liability of the State of Ohio was $25 for each retail, and $100 for each wholesale, outlet. Under §§ 16 and 17 of the Shipping Act, 1916, 46 U. S. C. §§ 815, 816 (1940 ed.), construed in *California* v. *United States,* 320 U. S. 577, 585–586 (1944), a violation was a misdemeanor punishable by a $5,000 fine. The Court's only arguable support lies in § 1 of the Elkins Act, 49 U. S. C. § 41, construed in *Union Pacific R. Co.* v. *United States,* 313 U. S. 450 (1941). Even there, the potential liability of a municipality not acting as a common carrier is a $20,000 fine, and, were illegal transportation rebates to be received by the municipality, three times the amount of the rebate. Even if a municipality were held

the Court come to grips with the plainly mandatory language of § 4 of the Clayton Act, 15 U. S. C. § 15 (1976 ed.): "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . *shall* recover threefold the damages by him sustained" (emphasis supplied), and the repeated occasions on which Congress has rejected proposals to make the treble-damages remedy discretionary.[2] It is one thing to leave open the question of remedy if there is a conceivable defense to damages whose theory is consistent with the mandatory language of the Clayton Act (*e. g.*, in the case of private utilities subject to state tariffs, that their conduct was required by state law and hence was involuntary). See *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 614–615, n. 6 (1976) (opinion concurring in judgment). It is quite another to delay the question of remedy in the absence of any suggested basis for a defense, especially where the prospect of insolvency for petitioner cities would so threaten the welfare of their inhabitants. The sensible course, it seems to me, is to consider the range of liability in light of the range of defendants for whom Sherman Act penalties would be appropriate.

to be operating a common carrier under that Act, potential financial liability is limited to the fine and the actual damages caused by the prohibited conduct. 49 U. S. C. § 8.

[2] *E. g.*, H. R. 4597, 83d Cong., 1st Sess. (1953); H. R. 6875, 84th Cong., 1st Sess. (1955); H. R. 978, 85th Cong., 1st Sess. (1957); H. R. 1184, 86th Cong., 1st Sess. (1959); H. R. 190, 87th Cong., 1st Sess. (1961). See also Hearings on H. R. 4597 before Subcommittee No. 3 of the House Committee on the Judiciary, 83d Cong., 1st Sess. (1953); Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 1st Sess., 189, 509–522, 2246–2249 (1955).