**Ronald L. JORDAN, Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**John MILLS, Business Manager, State Prison of So. Michigan, Jackson, Michigan, and David Sanford, Supervisor of the Inmate Store, State Prison of Southern Michigan, jointly and severally, Defendants.**

Civ. A. No. 77–71584.

United States District Court, E. D. Michigan, S. D.

March 8, 1979.

---

**14**

Ronald L. Jordan, pro se.

John P. Mack, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Lansing, Mich., for defendants.

---

MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

JULIAN ABELE COOK, Jr., District Judge.

This is a very unusual case. It involves a lawsuit instituted by an inmate at Jackson Prison who seeks to maintain a class action for declaratory and injunctive relief against two Defendants, one of whom is the Prison Business Manager, and the other being the Supervisor of the Prison's Inmate Store. The Complaint alleges violations of antitrust laws (The Sherman Act), regarding price fixing and other monopolistic activity by the Defendants in their operation of the prison's inmate store. 15 U.S.C. § 1 *et seq.* (1975).

Plaintiff was granted leave to proceed *in forma pauperis* under 28 U.S.C. § 1915 (1975). When offered appointed counsel to assist on the case, the Plaintiff cordially declined. The Government filed a Motion to Dismiss under Fed.R.Civ.P. 12(b)(6) or, in the alternative, for Summary Judgment under Fed.R.Civ.P. 56(b) & (c). The responsive pleadings of the Plaintiff indicate (as do other pleadings drafted by him in the file) that it was no tactical error for him to decline appointment of counsel. He is more than capable of carrying his own weight.

The Defendants argue in their motion for Dismissal/Summary Judgment that they are exempted from the reach of antitrust legislation because of the State action exemption first recognized in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and refined in a subsequent line of cases. In his Answer, the Plaintiff aptly focuses upon important language in the recent Supreme Court case *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 393–94, 98 S.Ct. 1123, 1125, 55 L.Ed.2d 364 (1978).

There the Court cited part of the holding of the Fifth Circuit below. The Circuit Court said that to utilize the exemption it was not required that the Defendants show express statutory authority to commit the acts alleged as violation of the antitrust laws. Notwithstanding this, the Appellate Court did say it was necessary to show "the challenged activity was clearly within the legislative intent." The Circuit Court put the onus on the trial court to determine if "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Id., quoting, City of Lafayette v. Louisiana Power & Light Co.,* 532 F.2d 431, 434–35 (5th Cir. 1976).

*Lafayette* was a plurality opinion [1] as was *Cantor v. Detroit Edison Co.,* 428 U.S. 579,

---

1. The Chief Justice joined in Part I of Justice Brennan's opinion, giving that portion of the opinion the impact of clear precedent. However, Part I, taken alone, is of no value to our

96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), another case where the Court tried to make a statement regarding the perimeters of the "State action exemption." The Court has been unable to come to a consensus about when the State action exemption comes into purview. *See* M. Handler, *The Murky Parameters of the State Action Defense: Antitrust 1978,* 78 Colum.L.Rev. 1374, 1374-88 (1978); M. Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term-1977,* 77 Colum.L.Rev. 979, 1005-16 (1977). *See also* Note, *Lafayette v. Louisiana Power & Light Co.—The State Action Doctrine & Municipalities,* 1979 Det.Coll.L.Rev. 299, 313-16 (1979).

Justice Stewart, with three other Justices, dissented from the position of the plurality and, in so doing, best characterized the position of the plurality.

> According to the plurality, governmental action will henceforth be immune from the antitrust laws only when "authorized or directed" by the state "pursuant to state policy to displace competition with regulation or monopoly public service." *Ante,* at 414, 413, [98 S.Ct., at 1137.] Such a "direction" from the State apparently will exist only when it can be shown "from a particular area, that the legislature contemplated the kind of action complained of." *Ante,* at 415, [98 S.Ct., at 1138.] By this exclusive focus on a legislature mandate the plurality has effectively limited the governmental action immunity of the *Parker* case to the acts of a state legislature. This is a sharp and I think unjustifiable departure from our prior cases.

*City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. at 427, 98 S.Ct. at 1144 (Stewart, J., dissenting).

Given the focus of the plurality upon legislative intent, we would be hard-pressed to say that the Michigan Legislature, when it granted the Department of Corrections and the Director of the Department broad powers to run the state prisons in Mich. Comp. Laws Ann. 791.202, .204, .206 & .211

(1970), contemplated the anticompetitive activity of its officials in running the inmate store. Nevertheless, it is incomprehensible that, if a "State action exemption" is to continue to exist, it would not apply to this case.

It may be that our case could get out from the reach of the plurality test of *Lafayette* because it deals with State officials or agents not State political subdivisions. The plurality went to extreme lengths to note such a distinction in their process of holding that the City was not immune under the exemption.

The problem with utilizing such a distinction comes from ambiguity within the opinion of the plurality. On the one hand, it is said "[t]hese decisions require rejection of the petitioners' proposition that their status as such automatically affords governmental entities the 'state action' exemption." *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. at 389 & n. 41, 98 S.Ct. at 1136. This statement clearly establishes that the plurality rejects any *per se* application of the exemption because it can be shown that the Defendant is a State official or agency. On the other hand, there is language to this effect: "We therefore conclude that the *Parker* doctrine exempts only the State as sovereign, or, by its subdivisions, pursuant to State policy to displace competition with regulation or monopoly public service." *Id.* at 411, 98 S.Ct. at 1137.

Consequently, this ambiguity renders any distinction based upon status of little help. *See also Id.* at 420, 98 S.Ct. 1123 (Burger, C. J., concurring).

The most recent case where the Court spoke with the clear voice of a majority regarding the State action exemption was *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). That case involved the applicability of the antitrust laws to an express prohibition of attorney advertising by Court and Disciplinary Rules of the Arizona Supreme Court. The Court found that the exemption was

resolving the problems found here. Our inquiry, therefore, leads us to the remainder of

Justice Brennan's opinion and Justice Stewart's dissent.

properly invoked in that context. The *Lafayette* plurality indicated that an essential premise to the *Bates* holding was a finding that the anticompetitive activity was expressly sanctioned by the State.

> We emphasized [in *Bates*], moreover, the significance to our conclusion of the fact that the state policy requiring the anticompetitive restraint as part of a comprehensive regulatory system, was one clearly articulated and affirmatively expressed as state policy, and that the State's policy was actively supervised by the State Supreme Court as the policymaker.

*City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. at 410, 98 S.Ct. at 1135.

Of course, the Stewart dissenters took a contrary position in *Lafayette* as to this aspect of *Bates*. "As noted in *Bates . .* 433 U.S. [at] 361, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810, actions of governmental bodies themselves present 'an entirely different case' falling squarely within the rule of *Parker v. Brown*." *Id.* at 431, 98 S.Ct. at 1146.

There is language in *Bates* which indicates things other than legislative mandate (or a showing of an intention for the legislation to encompass the anticompetitive activity) can precipitate a proper invocation of the State action exemption.

> [T]he Court emphasized in *Cantor* [*v. Detroit Edison*] that the State had no independent regulatory interest in the market for light bulbs. [Citations omitted] There was no suggestion that the bulb program was justified by flaws in the competitive market or was a response to health or safety concerns. And an exemption for the program was not essential to the State's regulation of electric utilities. In contrast, the regulation of the activities of the bar is at the core of the State's power to protect the public. Indeed, this Court in *Goldfarb* acknowledged that "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the *primary governmental function* of administering justice, and have historically been 'offi-

cers of the courts.'" . . . More specifically, controls over solicitation and advertising by attorneys have long been subject to the State's oversight. Federal interference with a *State's traditional regulation* of a profession is entirely unlike the intrusion the Court sanctioned in *Carter.*

*Bates v. State Bar of Arizona,* 433 U.S. at 361–62, 97 S.Ct. at 2697–2698 (emphasis supplied).

To the extent that we can read this portion of *Bates* as permitting the use of the exemption upon a strong and proper showing that the governmental agency is responding to health or safety concerns, or that its acting is essential to regulating the subject matter concerned (in our case, the prisons and prisoners), or that the regulation of the subject matter concerned (here —prisons and prisoners, in *Bates*—lawyers) is essential to a primary governmental function (or is within a State's traditional regulation of an area), then we would have to grant the Defendant's Motion and say the exemption is here applicable.

Clearly, the Department of Corrections by providing the services and performing the function it does, is responsive to the health and safety concerns of the public. This is beyond question. Nevertheless, it does not seem that providing an inmate store, and maintaining it, is something public health and safety mandates. Additionally, it does not seem necessary or essential to the State's maintenance of one of its prisons that it also maintain an inmate store. If such considerations as these were all we had before us, then I would agree with the Plaintiff. To wit, if the State wishes to engage in this non-essential business activity and attempts to make a profit, then it should either allow others to exploit the prison market (*arguendo* they constitute a market in the purview of the act) or give up its business activity.

However, as this Court reads *Bates,* such are not the only concerns relevant to determining if the exemption should operate. The Supreme Court has indicated that "[t]here is no doubt that discipline and ad-

ministration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene." *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969). We think it clear that regulation of prisons and prisoners is a "primary governmental function" within the meaning of the phrase as it appears in *Goldfarb* and *Bates* and that the State's "traditional regulation of" prisons and prisoners is "entirely unlike the intrusion the Court has sanctioned in *Carter*" or *Lafayette* or any other case.

As the Report of the Magistrate noted "[a]lbeit the state involvement is not as direct as that appearing in *Parker* or *Bates,* there are other considerations unique to the instant case. For example, maintenance and operation of a prison system involves sophisticated judgments concerning security. The Department is in the best position to evaluate this factor. Ordering the inmate store to be more responsive to the demands of the inmates by requiring that it deal with other suppliers may result in an increased flow of contraband as well as risk the safety of other inmates."

We elude to such illustrative concerns, not for the purpose of arguing or showing that public health and safety mandate maintenance of an inmate store, or that such maintenance is essential to prison or prisoner regulation, but rather to exemplify the latitude the Prison authorities need to properly effectuate this primary or traditional State governmental function. Federal interference in the exercise of this function via antitrust regulation is the type of threat to our federalism that fomented the Court to imply the "State action exemption" in the first instance. See *Parker v. Brown,* 317 U.S. at 351, 63 S.Ct. 307. *See also City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. at 438–40, 98 S.Ct. 1123 (Stewart, J., dissenting). *Cf. New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *National League of Cities v. Usery,* 426 U.S. 833, 847, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

For the reasons outlined above, this Court concludes that this is a proper case for application of the State action exemption to the Federal Antitrust Laws recognized in *Parker.*

The recognition of certain undertones in the *Bates* case regarding primary or traditional State functions gives us an occasion to make some comments about the applicability of *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 to this case. Although neither party has brought that case to our attention, we think it would be a serious oversight not to say something about it.

*Usery,* as characterized by Mr. Justice Brennan, was a case wherein the majority "repudiated principles governing judicial interpretation of our Constitution settled since the time of Mr. Chief Justice John Marshall." *Id.* at 857, 96 S.Ct. at 2476 (Brennan, J., dissenting). The majority found that 1974 Amendments to the Fair Labor Standards Act, as applied to State governmental employers, violated principles of intergovernmental immunity embodied in the Tenth Amendment to the Constitution. The Court conceded that the plenary scope of Congress' Art. I, § 8, cl. 3 Commerce Power would reach the same activity regulated by the statute if private employers were involved. The critical distinction, however, was founded upon the proposition that "[i]t is quite another [thing] to uphold a similar exercise of congressional authority directed, not to private citizens, but to the States as States." *Id.* at 845, 96 S.Ct. at 2471.

However, not all regulation of State activity or functions triggers the *Usery* immunity; only governmental functions essential to the separate and independent existence of the State. *Id.* Or, put another way,

We hold that insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the

authority granted Congress by Art. I, § 8, cl. 3.

*Id.* at 852, 96 S.Ct. at 2474.

The ambiguity as to what are or are not traditional governmental functions, and what activities are integrally operative to such functions, as well as the application of *Usery* to other Acts of Congress promulgated under its Commerce Power, have been the subjects of considerable comment. *See, e. g.,* Note, *Federal Securities Fraud Liability and Municipal Issuers: Implications of National League of Cities v. Usery,* 77 Colum.L.Rev. 1066, 1064–70 (1977).

In relation to our own case, we must begin from the very compelling premise, arising out of *Johnson v. Avery,* 393 U.S. at 486, 89 S.Ct. 747 and noted above, that prison discipline and administration are clearly State functions. Indeed, a function such as prison administration may well be one of the few unambiguous examples of a traditional governmental function essential to separate and independent existence that is not expressly enumerated in the *Usery* opinion. *See National League of Cities v. Usery,* 426 U.S. at 851 & n.16, 96 S.Ct. 2465. *Cf. Bounds v. Smith,* 430 U.S. 817, 835 (1977) (Burger, C. J., dissenting).

Unlike the *Usery* case, we do not have here a statute which violates the Tenth Amendment on its face. Congress, in its 1974 amendments, expressly made the Fair Labor Standards Act applicable to public agencies. With regard to the Antitrust laws here involved, Congress has not so expressly included the States or their agencies within its purview. However, as indicated in the *Lafayette* majority, the States and their subdivisions and agencies are persons within the meaning of the Antitrust laws, and moreover, "[t]he presumption against repeal by implication reflects the understanding that the antitrust laws establish overarching and fundamental policies, a principle which argues with equal force against implied exclusions." *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. at 394–97, 399, 98 S.Ct. at 1129. The State action exemption the Court announced in *Parker* is only one of two im-

plied exclusions ever recognized under the antitrust laws. That exemption is a limited one, however, and there may be circumstances where the exemption is not operative but where *Usery* may be applicable.

There is nothing in *Usery,* or the Tenth Amendment, that would indicate that the infirm Federal interference must be explicit, or for that matter, that it must be Congressionally provoked. The proposition that a Constitutionally valid statute or other legislative mandate can have a Constitutionally infirm application has been established in our jurisprudence for a long time. *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1885). Similarly, Constitutionally infirm interpretations placed upon otherwise valid statutes by the Court cannot stand. *See National League of Cities v. Usery,* 426 U.S. at 854–55 & nn. 18–19, 96 S.Ct. 2465. Therefore, if it was determined that the State action implied exclusion should not apply, it is possible that application of the antitrust laws to State activity could be imperishable under *Usery* if that activity operated to displace the States' freedom to structure integral operations in areas of traditional government functions.

This Court determines that such is the case here. In making such a judgment we are aware of the strong Federal policy underlying our antitrust laws. However, even in balance, the concerns of the State in operating prisons and matter incidental thereto are of a paramount concern. At least as those concerns are represented by the fact-pattern of this case.

Although the specific activity of the Defendants here could be characterized as a business enterprise, we are all too aware of the primary motive and purpose of the State to administer prisons. If we were to read *Usery* as inapposite because running a prison store is not essential to running the prison, this Court believes we would render *Usery* a nullity. Application of the antitrust laws would substantially restructure, significantly alter or entirely displace traditional methods through which the State administers the prisons and allows the prison-

ers to purchase incidentals. As noted earlier permitting the "market" of prisoners opportunity to purchase from other suppliers could create risks of harm to the prison's safe maintenance and of increased flow of contraband. I can think of few clearer examples of Federal interference with the State's freedom to structure integral operations in areas of traditional governmental functions than would be involved if we were to permit application of our antitrust laws here. The choice of having no prison store or providing the prisoners access to other suppliers permits the State no discretion, latitude or alternatives "regarding their manner in which they will structure delivery of those governmental services which their citizens require." *Id.* at 847–48, 96 S.Ct. at 2472.

The exact interface between the State action exemption and the intergovernmental immunity espoused in *Usery* is not clear. The various positions of the Justices at enmity in *Lafayette* evidences this. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. at 412 & n. 42, 423–24, 430–31 & 39, 98 S.Ct. 1123. Clearly, concerns regarding fundamental federalism bottom both doctrines. *See Id.* at 423, 98 S.Ct. 1123 (Burger, C. J., concurring). It is not necessary here to address distinguishing the two nor the policy concerns that predicate them. This Court simply determines (*arguendo* its conclusion is wrong that the State action exemption is properly applicable to this case) that the Defendants [2] are immune under *Usery.* Accordingly, the Defendants' Motion is granted.

Although the following statements are in no way related to the Court's opinion, we think something should be said about how this case comes to us. When lawyers think or speak of antitrust litigation, it seems inevitable that images come to mind of high paying corporate clients and keen lawyers, versed and immersed in one of society's few remaining jousting functions. Here, we have an indigent Plaintiff who is serving two life sentences in prison and who represents himself. Although he has not prevailed today, he has brought to this Court's attention, and perhaps he will bring to Higher Courts' attention, a complex issue of some great importance to our Federal scheme of government. The facts of his case are just peculiar enough to point out and highlight the various positions of members of our Supreme Court regarding the State action implied exclusion to our antitrust laws. I think this is some accomplishment for a layman who is to spend the rest of his days deprived of his liberty.

It is so ordered.

---

2. We note that *Usery* provided an immunity defense to State governmental subdivisions. Involved here are Defendants who are State officials. Clearly, there may be circumstances where an official may not be permitted to invoke the defense. We can think of many examples. However, although ¶¶ 3 & 4 of the Complaint name the Defendants in their official and individual capacities, these same paragraphs aver that the Defendants acted in their official capacities in their dealing with the inmate store. Nothing in the rest of the Complaint would indicate that the Defendants acted in any other than their official capacity in the committing and perpetuating the alleged wrongdoing. Therefore, there is an identity between the Defendants and State such that they have standing to ifvoke the *Usery* immunity. Moreover, the Complaint seeks preliminary and injunctive relief against the Defendants under 15 U.S.C. § 4 (1975). We take the Complaint, therefore, to be directed at the Defendants in their official capacities as Prison Business Manager and Inmate Store Supervisor because otherwise the State could avoid the impact of any injunction by simply replacing the named Defendants with some other persons—a result clearly abhorrent to the tenor of the Complaint.