929 F.2d 691
 1991-1 Trade Cases 69,388
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
AIRPORT PROPERTIES LTD PARTNERSHIP, Richard E. Snyder,
Managing General Partner, Plaintiffs-Appellants,
v.
CAPITAL REGION AIRPORT COMMISSION, Defendant-Appellee.
 No. 90-3004.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 29, 1990.
Decided April 3, 1991.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, District Judge. (CA-89-393-R)
 James Fendall Parkinson, III, Smith, Moncure, Blank, Isaacs & Hinton, Richmond, Va., for appellants.
 Paul Wilbur Jacobs, II, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., (Argued), for appellee; R. Harvey Chappell, Jr., Craig Thomas Merritt, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., on brief.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, WILKINS, Circuit Judge, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 The plaintiffs-appellants in this antitrust action are Airport Properties Limited Partnership ("APLP"), a Maryland limited partnership, and Richard Snyder ("Snyder"), a Maryland resident who is the managing partner of APLP. The appellee is Capital Regional Airport Commission ("CRAC").
 
 
 2
 We affirm the district court's dismissal of APLP and Snyder's claims that CRAC (1) monopolized parking services in the area surrounding Richmond International Airport, in violation of Section 2 of the Sherman Act, 15 U.S.C. Sec. 2 (Count I); (2) attempted to monopolize those services in violation of Section 2 of the Sherman Act (Count II); and (3) monopolized and attempted to monopolize in violation of the Virginia Antitrust Act, Va.Code Sec. 59.1-9(6) (1987) (Count III). Moreover, we find no error in the district court's dismissal of APLP and Snyder's claim of equitable estoppel.
 
 
 3
 We also affirm the court's summary judgment in favor of CRAC, that APLP and Snyder had failed to come forward with evidence to support their claim that CRAC and the James River Corporation had formed a contract and that APLP and Snyder were third party beneficiaries (Count IV).[1]
 
 I.
 
 4
 Richard E. Snyder and Airport Properties Ltd. filed their complaint on June 27, 1989 alleging the antitrust and estoppel claims. On September 11, 1989 the court granted CRAC's requested motion to dismiss (Counts I, II, III). The court's December 18, 1989 memorandum opinion stated the grounds for its dismissal of the antitrust claims as well as dismissing the equitable estoppel claim (Count VI). Summary judgment in favor of CRAC was granted on December 4, 1990 (Count IV).
 
 
 5
 The five decisive issues of this appeal stem from the following facts. APLP owns and leases land in Airport Plaza, a commercial tract near Richmond International Airport. APLP's suit arose from the James River Corporation's attempt to secure for itself, and allegedly for APLP and other owners/lessees of parcels in Airport Plaza as well, an easement to allow easier access to the nearby Richmond International Airport. APLP alleges that CRAC originally agreed to grant a virtually unrestricted access easement to James River and to all other owners/lessees in Airport Plaza. APLP also argues that CRAC reneged on that agreement when it learned that APLP might transfer some of its Airport Plaza property to a commercial parking operator to be used for remote airport parking. CRAC apparently did not want the easement to be used by any entity that might compete with its own airport parking facilities.
 
 
 6
 CRAC's refusal to grant the broad easement it had supposedly promised formed the basis of the allegations set forth in the complaint filed June 27, 1989.
 
 
 7
 In early 1988 Richmond Airport Limited Partnership ("RALP"), the predecessor in interest of APLP, entered into negotiations with James River.[2] James River intended to acquire some of RALP's property in Airport Plaza to build a demonstration manufacturing plant there. James River wanted to use the plant to "showcase" its business to customers and corporate executives; thus, it required easy access to Richmond International Airport. Accordingly, James River entered into negotiations with CRAC to acquire an easement over CRAC's land for the construction of an access road connecting Airport Plaza with Krouse Road, a street leading into the airport.
 
 
 8
 On March 29, 1988, CRAC adopted a resolution approving James River's request for the access road easement connecting Krouse Road with Airport Plaza. Only subsequently did James River negotiate with CRAC on behalf of itself as well as RALP, Snyder, and the owner of Airport Plaza, Charles R. Jones & Associates. On March 30, RALP concluded its negotiations with James River by transferring land in Airport Plaza to James River for construction of the plant. In May of 1988, James River sent CRAC a draft easement. James River, thereafter, began building its plant. The access road was built by CRAC but was paid for by James River. RALP and Jones contributed to James River's payment for the road.
 
 
 9
 Before approving the draft easement agreement, however, CRAC learned that RALP was negotiating to sell or lease other parcels it owned in Airport Plaza to a major commercial parking operator, which would use the land to operate a remote parking facility to serve airport customers. Upon learning of these negotiations, CRAC declined to sign the draft easement agreement because the easement described therein would have been broad enough to allow use by Airport Plaza tenants who might compete with CRAC's airport parking facilities.
 
 
 10
 CRAC later sent James River a substitute draft easement agreement designed to (1) limit use of the easement to vehicles carrying visitors to and from the James River plant, (2) make the easement exclusive to James River, and (3) grant others at Airport Plaza licenses subject to CRAC's prior approval. At a January 1989 meeting CRAC told representatives from RALP and James River that parking was a major source of the airport's revenue and that it had no intention of permitting a competing parking operation to use the now-completed access road.
 
 II.
 A.
 
 11
 On the basis of the state action doctrine, the district court rightly dismissed APLP and Snyder's claims of attempted and actual monopolization in violation of the Sherman Act. APLP and Snyder argue that CRAC's refusal of an easement, allowing their tenants to engage in the parking business, violated the statute. APLP and Snyder aver that the relevant product market is parking services at the airport. Furthermore, they contend that CRAC has monopoly power to control prices and exclude competition in the provision of parking services.
 
 
 12
 The state action doctrine was first articulated in Parker v. Brown, 317 U.S. 341 (1943). The Court held that the Sherman Act did not apply to a state's anticompetitive conduct. Id. The state action doctrine was extended to municipalities and other political subdivisions of the state in Lafayette v. Louisiana Power & Light Co., 435 U.S. 389 (1978). Lafayette, however, imposed a requirement that such political subdivisions demonstrate that they engaged in anticompetitive conduct pursuant to a clearly articulated state policy to displace competition. 435 U.S. at 410, 413. Town of Hallie v. City of Eau Claire, 471 U.S. 34 (1985), provided definition for the Lafayette clear articulation requirement. 471 U.S. at 40-47. Hallie held that for the clear articulation test to be met, the statute relied upon must clearly contemplate that the municipality engage in anticompetitive behavior. Id. at 42. State action immunity is not applicable if the statute is neutral as to such conduct. Id. at 43. Nevertheless, if the anticompetitive conduct is the foreseeable consequence of a statute's grant of power to the municipality, immunity is available. Moreover, it is not necessary that the statute state in explicit terms the foreseeability of the conduct. Id. at 42-43. CRAC's grant of power by the Virginia General Assembly passes the Hallie test on foreseeability grounds. Among the powers granted to CRAC were the following:
 
 
 13
 To grant to others the privilege to operate for profit concessions, leases and franchises, including but not limited to ... the accommodation and comfort of persons using its facilities and the providing of ground transportation and parking facilities for such persons, and such concessions, leases, and franchises shall be exclusive or limited when it is necessary to further public safety, improve the quality of service, avoid duplication of service, or conserve airport property and the airport's resources.
 
 
 14
 Va.Acts Ch. 410 Sec. 8(7) (1986). The text clearly contemplates anticompetitive conduct in parking services.
 
 
 15
 APLP and Snyder argue that Sec. 8(7) is inapplicable, rather Sec. 8(14) governs the disposing of property relevant in the granting of easements. Under Section 8(14) of the 1980 Acts of the General Assembly, Chapter 380, CRAC is allowed to:
 
 
 16
 sell, lease, grant options upon, exchange, transfer, assign, or otherwise dispose of any property, real or personal, or any interest therein, if such disposition is in the public interest and in furtherance of the purposes of this act or if such property is not necessary for the purposes of [CRAC].
 
 
 17
 Their argument is unpersuasive. Section 8(14) explicitly mentions the means by which airport property may be disposed; conversely, Sec. 8(7) clearly foresees the anticompetitive parking services without stating either the foreseeability or the means of the anticompetitive conduct. Under Hallie, however, the statute need not explicitly state this foreseeability. See 471 U.S. at 42-43. Moreover, requiring that the means of the anticompetitive behavior, an easement, be stated in the statute would make foreseeability meaningless. If Hallie does not require that a statute state that the anticompetitive conduct is foreseeable, it does not require that the conduct's means be stated to invoke state immunity. Accordingly, we affirm the district court's dismissal of the Sherman Act claims.
 
 B.
 
 18
 The Virginia Antitrust Act claims are also unsuccessful. APLP and Snyder argue that CRAC's conduct constitutes actual and attempted monopolization in violation of the statute. The text of the statute, however, does not support their argument. The act immunizes certain anticompetitive conduct:
 
 
 19
 Nothing contained in this chapter shall make unlawful conduct that is authorized, regulated or approved (1) by a statute of this Commonwealth, or (2) by an administration or constitutionally established agency of this Commonwealth or the United States having jurisdiction of the subject matter and having authority to consider the anticompetitive effect, if any, of such conduct.
 
 
 20
 Va.Code Ann. Sec. 59.1-9.4(b) (1987). The relief denied to APLP and Snyder under the Sherman Act is not available under the Virginia Antitrust Act because the latter does not "make unlawful conduct authorized" by Sec. 8(7) of the Capital Region Airport Commission Act.
 
 
 21
 Therefore, we affirm the district court's dismissal.
 
 C.
 
 22
 APLP and Snyder also argue that CRAC's conduct estops the denial of James River's or APLP's right to an essentially unrestricted easement. Under Virginia law, there are elements that must be proven by "clear, precise, and unequivocal evidence" to invoke estoppel:
 
 
 23
 (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the fact; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to its injury.
 
 
 24
 See Boykins Narrow Fabrics v. Weldon Roofing, 221 Va. 81, 86, 266 S.E.2d 887, 890 (1980).
 
 
 25
 APLP and Snyder allege that: (a) CRAC represented to APLP (as well as to James River) that it would grant the broad easement contained in the resolution, (b) APLP changed its economic position in reliance on this representation, (c) CRAC knew that APLP was relying on the representation, and (d) CRAC's refusal to grant the nonexclusive easement injured APLP.
 
 
 26
 We need not reach the verity of the allegations, as CRAC was acting in a governmental capacity and, thus, estoppel does not apply. If a municipality acts in a governmental, as opposed to a proprietary, capacity those acts are not estopped. Segaloff v. City of Newport News, 209 Va. 259, 163 S.E.2d 135 (1968).
 
 
 27
 APLP and Snyder contend that CRAC's denial of nonexclusive easement to protect its parking services was proprietary. They argue that the construction and maintenance of streets by a governmental body is a proprietary function. See, e.g., Norfolk v. Hall, 175 Va. 545, 9 S.E.2d 356 (1940). Moreover, the actions of a governmental entity are proprietary and may be subject to liability or estoppel where there is an element of "special corporate benefit or pecuniary profit." Hoggard v. Richmond, 172 Va. 145, 200 S.E. 610 (1939). APLP and Snyder argue that " '[i]t is the prevailing view in this country that the operation and maintenance of an airport constitutes a proprietary function on the part of a municipality....' " Bowling v. City of Roanoke, 568 F.Supp. 446, 448 (W.D.Va.1983) (quoting Crawford v. City & County of Denver, 278 F.Supp. 51, 52 (D.Colo.1967)).
 
 
 28
 We believe, however, that the determination of whether CRAC's denial of an easement was governmental or proprietary requires more than asking whether it operates and maintains an airport. The very cases that APLP and Snyder rely upon, Hoggard and Norfolk, make a distinction between constructing and maintaining streets, and the regulation and planning of streets, 200 S.E. 610, 611; 9 S.E.2d 356, 359. When a municipality or political subdivision engages in the planning and regulation of streets or public works, it acts in a governmental capacity. Id. Conversely when it engages in construction or maintenance, its activities are proprietary. Id.
 
 
 29
 James River's construction of the road is not at issue, rather the regulation of the users of the road. In this case, CRAC was engaged in the planning and regulation of streets when it denied a nonexclusive easement to APLP and Snyder. Thus, CRAC was acting in a governmental capacity. Accordingly, estoppel does not apply.
 
 D.
 
 30
 The trial court was correct in granting a motion for summary judgment on the issue of the formation of a contract and the existence of third party beneficiaries. Summary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of law. Charbonnages De France v. Smith, 597 F.2d 406, 414 (4th Cir.1979). The plaintiffs failed to produce evidence to indicate that a genuine factual dispute existed as to the purported contract and their status as ostensible beneficiaries.
 
 
 31
 To establish their claim, the plaintiffs have two evidentiary burdens to discharge. First, APLP and Snyder have to demonstrate that a contract did exist. This claim is subject to the fundamental rule of contract law:
 
 
 32
 [T]hird parties have no enforceable contractual rights if there is not a contract. Like other plaintiffs, they have the burden of proving that a contract has been made.
 
 
 33
 A. Corbin, The Law of Contracts Sec. 773 (1952). Second, APLP and Snyder also have to establish an additional element:
 
 
 34
 The third-party beneficiary doctrine is subject to the limitation that the third party must show that the parties to the contract clearly and definitely intended it to confer a benefit upon him.
 
 
 35
 Kelly Health Care v. Prudential, 226 Va. 376, 380, 309 S.E.2d 305, 307 (1983) (quoting Professional Realty v. Bender, 216 Va. 737, 739, 222 S.E.2d 810, 812 (1976)).
 
 
 36
 The text of the resolution makes it impossible for APLP to discharge the first evidentiary burden. According to the resolution CRAC approved the request of the James River Corporation for an easement. This approval did not constitute contractual acceptance, but rather it authorized the Executive Director to grant an easement. This authorization was subject to (i) required approval by FAA, the City of Richmond, and three counties; (ii) the concurrence of parties with existing rights in the proposed access area; and (iii) approval of the Commission's counsel of the relevant documentation. Such a "resolution authorizing the mayor or other officers to enter into a contract does not of itself, if not acted upon" constitute a contract. 10 E. McQuillin, Municipal Corporations Sec. 29.03 (3d ed. 1990). Thus, there was no contract to which APLP was a third party beneficiary.
 
 
 37
 APLP and Snyder unsuccessfully rely on extratextual evidence including: (1) James River's March 30, 1988 agreement with Snyder and Charles Jones providing for the payment, operation and maintenance of the new access road; (2) James River's decision to purchase fifteen acres in Airport Plaza on March 30, 1988 for $1,200,000 was contingent on it having access to Airport Road; and (3) three letters.
 
 
 38
 Neither do these facts establish a contract. The River/Snyder/Jones road agreement was signed the day after the resolution. More to the point, the resolution explicitly authorized James River to pay road construction and be responsible for its upkeep. While James River may have been free to share the costs with others or subcontract, nothing in the language of the resolution indicates that the parties intended to create a nonexclusive easement.
 
 
 39
 Moreover, the purchase of the fifteen acre parcel does not establish a contract. No evidence was offered by APLP and Snyder explaining why James River purchased the land. The purchase, without more, can not establish a contract.
 
 
 40
 Finally, the letters support neither the existence of a contract nor the plaintiffs as third party beneficiaries. The letters, in and of themselves, do not establish a meeting of the minds. The most significant letter, dated March 23, 1988, was not read by any relevant party until after the day of the resolution.[3] Moreover, the resolution does not by its terms express the letters' alleged intention, i.e., nonexclusive easement with the plaintiffs as beneficiaries. Even if there was a contract, there is no evidence, however, that shows that APLP and Snyder were intended as beneficiaries.
 
 III.
 
 41
 For the reasons discussed above the district court opinion is affirmed.
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 APLP and Snyder stipulated the voluntary dismissal with prejudice of their tortious interference claim (Count V)
 
 
 [2]
 Accordingly, APLP is the successor in interest to all rights in Airport Plaza previously held by RALP
 
 
 [3]
 James River's counsel's letter to Gary Rice described CRAC's service committee's recommendation for approval of the permanent easement of ingress and egress. The letter stated that "This access easement will, therefore, serve all of the remaining property now leased to Mr. Snyder (and not acquired as part of this transaction by James River)."